**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------X

EMILY CAPONERA,

Plaintiff,

-against-

EDUCATION PLUS CORPORATION d/b/a THE FAMILY FOUNDATION SCHOOL; BETTY ARGIROS; EMMANUEL ARGIROS a/k/a MICHAEL ARGIROS; CINDY ARGIROS a/k/a "CINDY RAY"; JEFFREY BRAIN a/k/a JEFF BRAIN; PAUL GEER; NBT BANK, N.A.; NBT BANCORP INC.; SYSCO CORPORATION; SYSCO SYRACUSE, LLC; THE HANCOCK HERALD; KASOS CO FAMILY LP; KASOS ENTERPRISES LLC; CHAPEL HILL LAND HOLDINGS LLC; FRENCH WOODS PERFORMING ARTS INC. d/b/a FRENCH WOODS SPORTS AND ARTS CENTER; K9-5 INC.; EAGLE VALLEY SEARCH, RESCUE AND RECOVERY TEAM, INC. d/b/a EAGLE VALLEY SEARCH DOGS; HIGHLIGHTS FOR CHILDREN, INC.; BOYDS MILLS (FORMERLY THE HIGHLIGHTS FOUNDATION); NATIONAL ASSOCIATION OF THERAPEUTIC SCHOOLS AND PROGRAMS; LACKAWANNA COLLEGE; VILLAGE OF HANCOCK, NEW YORK, individually and through the VILLAGE OF HANCOCK POLICE DEPARTMENT; TOWN OF HANCOCK, NEW YORK; DELAWARE COUNTY SHERIFF'S OFFICE; COUNTY OF DELAWARE, NEW YORK; and DELAWARE COUNTY BOARD OF SUPERVISORS,

Defendants.

--------------------------------------------------------------------X

Case No.:
3:26 -cv- 2118 (AJB/ML)

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Emily Caponera, by her attorneys, Johannesen & Umana, P.C., for her Verified Complaint against Defendants, alleges as follows:

## PRELIMINARY STATEMENT

1. From no later than August 1990 through the school's 2014 closure, Defendants operated the Family Foundation School ("FFS") in Hancock, New York, disguised to the public, to parents, and to the educational consultants who referred children to it as a therapeutic boarding school for troubled adolescents. In reality, FFS confined the minor children placed in its custody, including

Plaintiff Emily Caponera, delivered to FFS from Chappaqua, New York at fourteen years of age in August 1999 by off-duty or retired police officers engaged for the purpose, and held there until June 2002, at seventeen, under conditions of forced, uncompensated labor, public sexualized humiliation, food deprivation, punitive isolation, and censored contact with her family, while extracting tuition and charges of, on information and belief, approximately thirty thousand dollars per year, approximately ninety thousand dollars in all, from Plaintiff's parents on the representation that a fourteen-year-old with poor grades and a diagnosed attention disorder would receive licensed therapeutic treatment and an education. Immediately upon her arrival, Plaintiff was strip searched. Rather than receive any clinical treatment, she was taken off the medication she had been prescribed, was never seen by a psychiatrist, psychologist, or physician on the campus, was placed in a family unit under Robin Ducey, and was transported out of the country, to Toronto, in the custody of Defendant Paul Geer, the staff member who ran the institution's trips, who was convicted in 2025 of transporting FFS students across state and international lines for sexual activity on the same recurring trips on which Plaintiff herself was transported to Toronto, Washington, D.C., Virginia, and Pennsylvania.

2. FFS's unlicensed and abusive operation was already a matter of public record when Plaintiff arrived: in August 1990, the New York State Division of Alcoholism and Alcohol Abuse issued FFS a formal, public cease and desist order for operating without the license New York law required. Defendants continued to operate, enroll, and confine children, including Plaintiff, delivered to FFS nine years later, in open disregard of that order, while representing to Plaintiff's parents and to the educational consultant who referred her that FFS was a qualified therapeutic institution equipped to treat her.

3. Plaintiff came to FFS by force. In August 1999, Plaintiff, then fourteen, a student at Horace Greeley High School in Chappaqua, was taken from her home and delivered to the FFS campus by off-duty or retired police officers acting as escorts for the institution, an arrangement FFS recommended to placing parents and, on information and belief, arranged. She was surrendered into the institution's custody for poor grades, marijuana use, and the behavioral difficulties of a fourteen-year-old with an attention disorder for which she had been prescribed medication and had seen a therapist.

4. FFS took a fourteen-year-old on prescribed medication and under the care of a therapist and gave her neither. She never took her medication at FFS. She never saw a psychiatrist, psychologist, or physician on the campus; the only medical personnel she encountered there was a nurse. In place of treatment she received the corner, enforced silence, tuna and Maypo, buckets of rocks in February, kitchen and laundry duty, and a "table topics" session at which she was made to sit through an account of a member of her family unit having sex with sheep. In place of an education she was run through doubled college-credit courses, sold to her parents as the means of graduating her on time and billed to them separately, credits that no college ever accepted.

5. FFS's control of Plaintiff was gendered from the first hour. The intake search made a fourteen-year-old girl strip naked before staff and remove the ring from her tongue while she stood unclothed. Table topics were used to expose her to sexual material. That conduct, directed at Plaintiff because she was a girl, is pleaded herein as part of the regime of coercion by which her labor was obtained and as the basis of her claims for the offenses committed against her person.

6. Plaintiff's contact with her family was censored throughout her enrollment under the institution's mail and telephone rules. In the years after she left, Plaintiff suffered post-traumatic stress disorder for which she has treated with therapists for years, was unable to sustain

relationships, and, by reason of that condition, aggravated in 2018 by the public attention then given to the claims of survivors of childhood abuse and to the accounts of other former FFS students, lost in that year her half interest in a business grossing more than one million dollars a year, a retail business of her own, and her home; the 2024 indictment and 2025 public trial of Paul Geer have aggravated that injury again.

7. Following FFS's 2014 closure, its principals, Defendants Emmanuel Argiros and Cindy Argiros, moved the enterprise's remaining assets, including the FFS real property itself, into family-controlled entities and the hands of a longtime friend and neighbor of the Argiros family at below-market value rather than preserve them to answer for the decades of conduct described herein, and thereafter remained silent even after that conduct was judicially confirmed at the 2025 federal criminal trial of Defendant Paul Geer. The dormitories, the chapel, the kitchen Plaintiff ran each morning, the walkways she shoveled, and the buildings and grounds she cleaned and inspected without pay are the same structures and the same land on which the purchaser's affiliate, the French Woods performing arts camp, has housed, fed, and charged paying campers every summer since; on information and belief, that camp charges up to approximately $16,000 per camper for a summer on the campus the children of FFS built and kept. The enterprise's last transaction was not a sale; it was the conversion of the children's labor into a revenue-producing property that still produces revenue today, for an entity that had been the Argiros family's neighbor and friend for many years, and that has never been asked to account for it.

8. The evidence and testimony adduced in the 2025 federal criminal prosecution of Defendant Paul Geer, an FFS staff member throughout Plaintiff's enrollment and the staff member in whose custody Plaintiff was transported to Toronto, convicted on March 3, 2025 after a two-week jury trial and sentenced on September 4, 2025 to 327 months in federal prison for sexually abusing and

trafficking FFS students across state and international lines, including on a trip to Toronto in 2001, during Plaintiff's enrollment, revealed for the first time the coordinated, institutional, and enterprise character of the conduct at FFS across decades of its operation, including the deliberate destruction of student and abuse-complaint records by the Argiros family, the institution's practice of billing families for the overnight isolation of their children, and the admission of the institution's own president that it employed no clinical professionals, facts Defendants had concealed for decades. That disclosure, and the events described herein, gave rise to the filing of this action.

9. Plaintiff brings this action seeking compensatory damages, trebled where applicable under RICO, together with punitive damages, attorneys' fees, and costs as set forth herein.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) based upon Plaintiff's claims under 18 U.S.C. § 1962 (RICO), 18 U.S.C. §§ 1589, 1590, 1591, and 1595 (Trafficking Victims Protection Reauthorization Act), 18 U.S.C. § 2255, and 42 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

11. This Court has independent jurisdiction pursuant to 18 U.S.C. § 1964(c), which confers federal jurisdiction over civil RICO claims.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and transactions giving rise to Plaintiff's claims occurred within the Northern District of New York. Specifically: (a) the Family Foundation School, the institution at which Plaintiff was confined, forced to labor, strip searched, and subjected to the sanction regime described herein, is located in Hancock, New York, within this District, and the principal conduct giving rise to Plaintiff's claims occurred there; (b) the tuition payments giving rise to Plaintiff's RICO injury

were transmitted to and processed within this District; (c) Plaintiff was transported from this District to Toronto, Ontario, Canada, to Washington, D.C., to Virginia, and to Pennsylvania and back on the trips described herein; and (d) the federal criminal prosecution of Paul Geer described herein was conducted in this District.

13. This Court has personal jurisdiction over each Defendant because each Defendant resides in, is organized under the laws of, maintains offices or operations in, or transacted business in the State of New York, and because each Defendant committed acts and omissions giving rise to Plaintiff's claims in the State of New York.

## THE PARTIES

### Plaintiff

14. Plaintiff Emily Caponera is an adult individual, born on September 21, 1984, who was enrolled at FFS under her maiden name, Emily Bock, from August 1999 through June 2002, arriving at fourteen years of age and leaving at seventeen. She appears in Defendants' records under her maiden name. Plaintiff was raised in Chappaqua, Westchester County, New York, and currently resides in the State of Florida.

15. Prior to her placement at FFS, Plaintiff was a student at Horace Greeley High School in Chappaqua, New York. She had been diagnosed with an attention disorder, for which she had been prescribed Adderall and Ritalin, and she had seen a therapist and a psychiatrist intermittently. Her difficulties were those of a fourteen-year-old: poor grades, marijuana use, and behavioral problems at home and at school. She had never been hospitalized and had no history of violence.

16. Plaintiff's parents were referred to FFS by an educational consultant, whose identity is within their records and Defendants' knowledge, and who, on information and belief, received compensation or reciprocal referrals from FFS for placements made there. Her parents paid FFS

tuition and charges of, on information and belief, approximately thirty thousand dollars per year, approximately ninety thousand dollars over the three years of her enrollment, by checks and payments transmitted from Westchester County through the United States mail, together with the separate charges for the college-credit courses described herein. FFS represented to Plaintiff's parents and to the referring consultant that it was a qualified therapeutic boarding school staffed to treat adolescents with the conditions for which Plaintiff was placed there, which it was not. On information and belief, those payments were deposited to the School's operating account, which was operated by Sovereign Bank until November 10, 2000 and, from that date, by NBT Bank, which acquired the account with its deposit history.

17. In August 1999, Plaintiff, then fourteen years old, was removed from her home in Chappaqua and transported to the FFS campus in Hancock, New York, by off-duty or retired police officers acting as escorts, a service FFS recommended to placing parents and, on information and belief, arranged. Immediately upon her arrival, Plaintiff was strip searched pursuant to FFS's intake policy, required to remove all of her clothing and, while naked, to remove the ring from her tongue, and, on information and belief and consistent with the institution's uniform intake practice, photographed. No medical screening preceded the search, no parent was present, and no lawful authority permitted it.

**Defendants**

18. Defendant Education Plus Corporation, doing business as Family Foundation School (hereinafter "FFS"), is a New York corporation with its principal place of business at 431 Chapel Hill Road, Hancock, New York 13783. FFS was the primary vehicle through which the racketeering enterprise described herein operated, providing the institutional facade, physical campus, staff hierarchy, marketing apparatus, and referral network through which children,

including Plaintiff, were recruited and confined. FFS misrepresented to parents and to the educational consultants who referred children to it that it provided qualified therapeutic, psychiatric, and psychological treatment services to enrolled students while it employed no qualified professionals with which to provide such services. In its final years of operation, FFS operated under the name Allynwood Academy.

19. Defendant Betty Argiros co-founded FFS together with her husband, Tony Argiros, and served as a founder, administrator, and Program Director of FFS throughout the period of Plaintiff's enrollment, during which both Tony and Betty Argiros were personally present at and involved in the institution's daily operation. Defendant Betty Argiros was the architect of the enterprise's operational policies, including the family-unit structure, the sanction and work-labor system, the isolation and food sanction regime, the intake strip search and photography practice, and the culture of institutional secrecy within which the conduct described herein was able to occur. FFS's own published Handbook stated that Tony and Betty Argiros were the heads of the household, that they represented the parents of the house, and that they had the final say on all matters and did not have to explain themselves to students.

20. Defendant Emmanuel Argiros a/k/a Michael Argiros is an individual who succeeded Tony and Betty Argiros as president of the FFS board beginning in 1993 and who owned, operated, and directed FFS and Education Plus Corporation in that capacity throughout Plaintiff's enrollment and through the school's closure in 2014. Defendant Argiros was, on information and belief, the custodian of the institution's student records, and personally destroyed evidentiary records by shredding, as described herein. Defendant Argiros currently owns and personally operates KASOS Enterprises LLC d/b/a Smith's Colonial Motel and Upper Delaware Inn in Hancock, New York, owns Kasos Co Family LP, which was an owner of the FFS real property, and owns K9-5 Inc.

21. Defendant Cindy Argiros, who publishes and is publicly known under the name “Cindy Ray” and as “Cindy Ray Argiros,” is an individual who, on information and belief, is married to Defendant Emmanuel Argiros, and who, during Plaintiff’s enrollment, taught the government class in which Plaintiff was enrolled and, on information and belief, participated in the administration of the sanction, labor, and food regime imposed upon its students. Defendant Cindy Argiros is the owner, editor, and publisher of Defendant The Hancock Herald, and is named in this action additionally with respect to the fraudulent concealment alleged in Count XII and the fraudulent conveyance described herein, as a beneficial owner and controller, together with Defendant Emmanuel Argiros, of the Kasos entities and K9-5 Inc. described herein.

22. Defendant Jeffrey Brain a/k/a Jeff Brain is an individual who served in FFS’s senior leadership as its Director of Admissions for approximately nine years through the school’s 2014 closure, and as its Vice President for External Relations, in a tenure that began after Plaintiff’s enrollment and continued the enterprise’s marketing and concealment through its closure. As Director of Admissions, Defendant Brain directed the admissions and external relations apparatus through which the enterprise recruited and confined the children who followed Plaintiff, collected tuition, and concealed the conduct to which Plaintiff had been subjected. He is named as a Defendant with respect to the fraudulent concealment alleged in Count XII, the aiding and abetting of that fraud alleged in Count XIII, the enterprise concealment conduct alleged in Counts I and II, the knowing profit and advancement alleged in Counts V, XX, and XXI, and the obstruction of enforcement alleged in Counts XVIII and XIX. In his external relations capacity, Defendant Brain was the named contact for and, on information and belief, an author or approving officer of the institution’s May 2008 public response to oversight hearings of the United States House of Representatives Committee on Education and Labor, in which the institution publicly minimized and

mischaracterized the institutional practices alleged in this Complaint, including the practices to which Plaintiff had been subjected, continuing and maintaining the enterprise's concealment of that conduct and keeping the families of former students, including Plaintiff's, deceived as to what had been done to their children.

23. Defendant Paul Geer is an individual who was employed by FFS from the 1990s through its 2014 closure, including as a teacher, as the director of its choir, and as the staff member in custody of children on its trips off the campus, and who, on March 3, 2025, was convicted by a federal jury in this District, after a two-week trial, of federal sex offenses committed against FFS students, including the coercion and enticement of children in FFS's custody to travel and their transportation in interstate and foreign commerce for sexual activity, including to Toronto, Ontario in 2001, during Plaintiff's enrollment, and was sentenced on September 4, 2025 to 327 months in federal prison. Geer was on staff, in custody of children, and in charge of trips off the campus throughout Plaintiff's enrollment, and he transported Plaintiff herself, a minor in the institution's custody, out of the country to Toronto on the institution's recurring trips there. On information and belief, and as established at his criminal trial, Geer had confessed sexual misconduct with students to FFS's administration years before Plaintiff's enrollment, and FFS, through the Argiros Defendants, kept him on staff, in custody of children, and in charge of trips off the campus throughout Plaintiff's enrollment.

24. Defendant Kasos Co Family LP is a New York limited partnership owned and controlled by the Argiros Defendants, which held title to the FFS real property and transferred it to Defendant Chapel Hill Land Holdings LLC in November 2014 at below-market value. Defendant Kasos Enterprises LLC is a New York limited liability company likewise owned and controlled by the Argiros Defendants.

25. Defendant Chapel Hill Land Holdings LLC is a New York limited liability company that acquired the FFS real property from Kasos Co Family LP in November 2014 and an additional parcel from Defendant Emmanuel Argiros in June 2016, in each case with actual or constructive notice of the claims against the transferors. On information and belief, Chapel Hill Land Holdings LLC is the acquisition entity of, or is affiliated with, the French Woods performing arts camp, the purchaser identified in the school's own closing announcement, which described the purchaser as "a neighbor and friend of the school and the Argiros family for many years." On information and belief, institutional records of FFS that survived the destruction described herein remained on the former campus property after the 2014 closure, stored in an outbuilding on that property, within the possession and control of Chapel Hill Land Holdings LLC as its owner, for approximately a decade, and were never voluntarily disclosed or produced to law enforcement, being recovered only upon the execution of a federal search warrant, as confirmed by law enforcement testimony at Paul Geer's 2025 federal criminal trial. On information and belief, the November 2014 conveyance of the FFS campus was made for consideration of approximately two million dollars, a price materially below the value of the property conveyed, which comprised a multi-structure campus improved and maintained over decades by the uncompensated labor of FFS students, including Plaintiff. On information and belief, since acquiring the campus, Chapel Hill Land Holdings LLC and the French Woods camp with which it is affiliated have operated a residential summer camp on it, housing campers and staff in the dormitories, feeding them from the kitchen, and using the chapel, the fields, the grounds, and the outbuildings, so that the buildings and grounds that FFS children built, repaired, cleaned, and maintained without pay have been put to commercial use every season since, and Chapel Hill Land Holdings LLC continues to receive the benefit of that labor with each season it operates: on information and belief, the camp charges each camper's

family tuition of thousands of dollars per session, up to approximately $16,000 per camper for a full summer, and the dormitories, dining facilities, chapel, fields, and grounds for which those families pay are the ones the children of FFS, including Plaintiff, built, repaired, cleaned, and maintained without pay. That benefit is not historical: it is received anew each year, on property whose improvement and upkeep were the children's work, by an entity that had been, in the school's own words, a neighbor and friend of the school and the Argiros family for many years, and that, on information and belief, knew from that relationship how the campus it bought had been run. Chapel Hill Land Holdings LLC knew, or recklessly disregarded, what the property it took had been and how it had been built and kept, and it turned a blind eye to that knowledge because the transaction was profitable. It was not a purchaser without notice. It took the campus as a transferee with actual or constructive notice of the claims against its transferors, for less than its assessed value, from the family-controlled entity into which the Argiros family had moved the property when the State came to investigate, at a time when the School had been publicly accused, publicly investigated, and publicly closed, and it took it on the financing of the School's own secured lender, which released its liens on the School's collateral one month after the conveyance and took the buyer as its new borrower. Its principal, on information and belief Ronald Schaefer, the founder of the French Woods camp, sits on the board of Hancock Partners, Inc. under Defendant Emmanuel Argiros, the School's president, alongside the manager of the NBT Bank branch that handled the School's payroll; the School, the bank that held and lent its money, and the buyer that took its land are represented on one board by the people who ran them. The School's own closing announcement identified the purchaser as a neighbor and friend of the School and the Argiros family for many years. The buyer took the dormitories, chapel, kitchen, and grounds as they stood, built and maintained by children without pay, with the School's records in an outbuilding on the premises,

and put them to paying use the next summer. Those are the facts of a party that knowingly benefits, financially and by receiving things of value, from participation in a venture it knew or should have known was engaged in forced labor: it received the venture's principal asset at a discount, from an insider, on the venture's own credit, with the venture's evidence on the property, and it has drawn revenue from that asset every season since. NBT Bank and Chapel Hill Land Holdings LLC profited from the same labor through the same property, the bank by lending against the collateral the children built and taking its payoff when that collateral was sold, the buyer by acquiring and operating it, and both sit, through their principals, on the board of the corporation the School's president leads. The 2014 conveyance was not a sale to a stranger. It was the transfer of the enterprise's principal asset to a knowing beneficiary, on the enterprise's own bank's money, for less than it was worth, after the enterprise had been accused, and that is how both of them have kept it. Defendant French Woods Performing Arts Inc., doing business as French Woods Sports and Arts Center, is, on information and belief, a New York business corporation with its principal place of business at Hancock, New York, which operates the residential summer camp on the former FFS campus at 431 Chapel Hill Road and is the operator of record of that camp with the American Camp Association; it is, on information and belief, owned and directed by Ronald Schaefer, its founder, and Beth Schaefer, and is the entity through which the Schaefer family operates the French Woods camps. French Woods Performing Arts Inc. took possession of the campus at or about the time of the November 2014 conveyance and has operated it as a camp every season since, housing, feeding, and charging campers for the dormitories, dining facilities, chapel, fields, and grounds that the children of FFS, including Plaintiff, built and maintained without pay, at a charge, on information and belief, of approximately $4,500 per three-week session per camper and up to approximately $16,000 per camper for a full summer. Its directors and staff occupied and used the

campus and its outbuildings each season from 2015 forward; on information and belief it had possession and control, with Chapel Hill Land Holdings LLC, of the outbuilding in which the School's records were kept, and it was the entity on the campus from which the Argiros family retrieved School records after the closure, as the Argiros family testified at the Geer trial. French Woods Performing Arts Inc. knew, or recklessly disregarded, what the campus it operated had been and how it had been built, and it has knowingly benefited, financially and by receiving things of value, from participation in the venture by taking that campus as its inventory and drawing revenue from it every season since. On September 10 and again on September 29, 2026, Plaintiff's counsel served Chapel Hill Land Holdings LLC, through its attorneys, with a Notice to Preserve Evidence and a Notice and Request for Entry Upon Land for Inspection directed to the outbuilding on the former campus at 431 Chapel Hill Road and the records stored in it. On October 2, 2026, Chapel Hill Land Holdings LLC, through its attorneys, responded in writing that it "is not aware of any such shed," that "there is nothing to inspect," that it is "an innocent purchaser of land that has absolutely nothing to do with the events at issue in this litigation," and that it "will not make the premises available for inspection." A federal agent took part in the search of that campus under a federal warrant and recovered from it the School's records that were used at the 2025 criminal trial, as he testified under oath at that trial; Chapel Hill Land Holdings LLC now denies that the structure from which they were recovered is on the property. On information and belief, the outbuilding and the records within it existed on the campus, within the possession and control of Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc., when the notices were served, and the October 2, 2026 denial and refusal was a further act of concealment, made with knowledge of this litigation and of the federal proceedings that preceded it.

26. Defendant K9-5 Inc. is a New York corporation, formally incorporated in 2014 immediately after FFS ceased operations, to which the Argiros Defendants transferred the enterprise's canine operation and related assets, including the dogs for whose care and training FFS students, on information and belief, had been used as unpaid labor.

27. Defendant NBT Bank, N.A. is a federally chartered national bank that, directly and through its predecessor, has maintained a continuous banking presence in the Village of Hancock, New York since 1907, a period encompassing the entirety of Plaintiff's 1999-2002 enrollment and FFS's operational life from its founding through its 2014 closure, and that was at all relevant times the sole commercial bank in a village of fewer than 1,200 residents. From November 10, 2000, and at all relevant times thereafter, NBT Bank, N.A. held one or more accounts in the name of Education Plus Corporation d/b/a Family Foundation School and, on information and belief, in the names of its principals, through which the tuition payments, including, on information and belief, the tuition paid on Plaintiff's behalf from November 10, 2000 forward and, through the deposit history the bank acquired on that date, the record of the payments made for her before it, the payroll of the institution's staff, and other financial proceeds of the racketeering enterprise described herein were deposited, processed, and disbursed. As the bank serving the Village of Hancock throughout the relevant period, NBT Bank received substantial financial benefit from that account relationship, and knew or should have known from the scale of that revenue and the publicly available record of FFS's unlicensed and abusive operation, including the August 1990 cease and desist order, that the institution from which it was receiving that benefit was operating unlawfully. The public record shows blanket security interests in Education Plus Corporation's operating assets filed in 2002, 2004, and 2006, covering the operation's equipment, inventory, accounts, general intangibles, and contract rights together with their proceeds, so that the bank's collateral included the tuition

receivables and enrollment contracts themselves, including the contract under which Plaintiff was enrolled, and the food inventory that Plaintiff, as the head of the institution's breakfast crew, drew from its coolers and prepared and, on information and belief, unloaded from Sysco's trucks; new security interests taken from both Education Plus Corporation and Kasos Co Family LP on November 19, 2008, months after the congressional hearings described herein; a recorded loan of six hundred eighty thousand dollars to Kasos Co Family LP, the family entity then holding title to the FFS campus, on March 24, 2010; continuations of its filings in 2010, 2011, and 2013; Uniform Commercial Code termination statements filed on December 12, 2014, in the course of the wind-down, releasing the liens on the school's collateral while the banking relationship itself continued; and, on February 27, 2015, a new blanket security interest against Chapel Hill Land Holdings LLC. On information and belief, the bank's own underwriting and collateral standards required, as a condition of extending and continuing that secured credit, the inspection of the collateral and the campus, the appraisal of the campus, and the review of the operation's financial statements, and the bank repeatedly conducted those inspections and reviews over the life of the relationship; had it done so, it would have seen an operation whose only revenue was tuition, whose expenditures on the housing, feeding, and staffing of the children in its custody fell far below what any lawful residential facility spends, and whose margin was made by the children's unpaid labor, and whose capacity to repay depended on the continued confinement of those children; and if the bank did not do so, its departure from its own standards was a deliberate avoidance of the knowledge those standards exist to supply. On either footing, the bank knew or consciously avoided knowing. The bank did not need to ask anyone for the operation's financial records: it already held them, because the operation's accounts were the bank's own accounts, and every tuition deposit, every disbursement, and every payroll check passed through the bank's own ledgers. Federal law

required NBT Bank, as a national bank, to maintain a program to know its customers and to detect and report suspicious activity, and under that program and the bank's own standards the bank was required to know who owned and controlled the School, the nature and purpose of its accounts, and the source of the funds that moved through them; that obligation did not end at the opening of an account but attached anew to each credit decision and each periodic review of the relationship, so that knowing what the School was and how it made its money was not a matter of the bank's discretion but of its continuing legal obligation. The bank discharged that obligation, or was required to, at identifiable moments: on information and belief, when it acquired the School's account on November 10, 2000 and re-documented the acquired accounts in its own name; when it took its first blanket security interest in the School's receivables, inventory, and contract rights on December 2, 2002, and again at each renewal in 2004, 2006, 2008, 2010, 2011, 2013, and 2016; when it underwrote the March 24, 2010 mortgage; and when it financed the transferee in 2015. At each of those moments the bank was required, under the program federal law obliged it to maintain and under its own standards, to know its customer: who owned and controlled the School, the purpose of its accounts, the source and character of the funds moving through them, and the risk the relationship presented. On information and belief, in discharging that obligation the bank knew that the School's only revenue was tuition paid for children held in residential custody, that the payroll the bank itself cut and cashed carried no licensed psychiatrist, physician, or clinical professional, and that the School's expenditures bore no relation to the housing, feeding, and staffing of the children whose tuition it was; and if the bank did not know those things, it was because it did not perform the inquiry that federal law and its own standards required, a deliberate avoidance of the knowledge that inquiry exists to supply. On either footing the knowledge is the bank's. Because it was at once the depository and the secured lender, NBT Bank saw both sides of the operation. From

its own ledgers it saw what came in, tuition paid for children held in residential custody, and what went out. From the appraisals and inspections its secured lending against the campus required, it saw what stood on the land it lent against and what was added to it from one credit renewal to the next: the dormitories, the chapel, the kitchen, the fields, and the grounds, improved, repaired, and maintained between inspections. On information and belief, the accounts the bank held showed no payments to contractors, builders, or tradesmen commensurate with those improvements, and no payroll for the maintenance, custodial, kitchen, laundry, and grounds staff that a residential facility for that number of children requires, because the children were doing that work; the collateral the bank appraised grew while the expenditures that should have produced it did not appear in the accounts the bank held. On information and belief, the same inspections showed the bank the housing in which the children it lent against were kept, including converted barns and trailers in which the children slept in rooms fitted with multiple sets of bunk beds, several children to a room, and a plant that, on information and belief, could not lawfully house the number of children whose tuition the bank was taking in. On information and belief, NBT Bank appraised and lent against improvements for which no construction payments passed through the accounts it held, on a campus it had inspected and knew to be housing more children than its structures were built to hold, and it knew, or consciously avoided knowing, that those improvements were the children's work. The money paid for Plaintiff's enrollment did not leave the enterprise when she did. On information and belief, the tuition her family paid became the operation's receivables, deposits, and working capital, was spent on the operation's continuation and on the campus, inventory, and improvements against which the bank lent, and was carried, as the proceeds and the collateral of the enterprise, in the accounts and under the liens the bank held and renewed through December 18, 2021, so that the bank's obligation to know its customer, and its knowledge of what the customer

was, attached not only to the years of Plaintiff's enrollment but to every year in which it continued to hold, lend against, and profit from what her family had paid. Neither the 2008 congressional testimony nor the 2014 closure and sale, nor the 2024 indictment, nor the 2025 conviction of Paul Geer, prompted the bank, on information and belief, to file a Suspicious Activity Report, or prompted it to make any report to any regulator or law enforcement agency, to freeze or hold any account, funds, or transaction pending inquiry, as banks routinely do, or to decline the transactions before it; instead, on information and belief, the bank financed the conveyance of the campus, collected satisfaction of its own credit from it, and took the transferee as a new lending customer. NBT Bank's repayment under those instruments depended on the School's continued enrollment of children and continued receipt of tuition. Its return was not a fee on a customer's ordinary accounts but a stake in the operation itself, and its interest, like that of every Hancock business the School's revenue supported, was in that operation continuing. As the only commercial bank in the Village of Hancock, NBT Bank held the village's deposits, extended its credit, and financially sponsors the corporation whose stated purpose is to "combat community deterioration"; on information and belief, a substantial share of the Hancock branch's deposits and lending derived from the School's revenue and the families and businesses that revenue sustained, so that the bank's position in the village, like the village's, was bound to the School's survival. NBT Bank's relationship with the School's president was institutional, not personal. NBT Bank is a member, in its own name, of the Hancock Area Chamber of Commerce, is listed in the Chamber's directory as its banking member on a website published by the Town of Hancock, and pays its dues into a treasury Defendant Emmanuel Argiros keeps as the Chamber's treasurer. NBT Bank financially sponsors Hancock Partners, Inc., the economic-development corporation Defendant Emmanuel Argiros presides over, and Dawn Joyce, the manager of NBT Bank's Hancock branch for

approximately eighteen years, whose duties included the School's accounts and credit, serves under Defendant Emmanuel Argiros as a director of that corporation. Her knowledge of the School, its finances, and its president, acquired in managing the branch that held the School's accounts and administered its credit, was material to her duties and is the knowledge of NBT Bank. The relationship ran in both directions. NBT Bank receives, through the same apparatus, the promotion of its own business: it is held out, on the Chamber of Commerce directory the Town publishes, as the community's bank, the only banking member listed, in a directory kept by the School's president as the Chamber's treasurer; through its branch manager's seat on the Partners board it is placed before the businesses and projects that corporation serves, under a president who was the bank's customer; and, on information and belief, it has drawn deposits, loans, and customers from that standing. That standing, conferred through organizations the School's president ran and whose own revenue depended on the School, was a thing of value the bank received from the relationship and had reason to keep. NBT Bank did not open the School's operating account; it bought it. On November 10, 2000, NBT Bank, through its Pennstar Bank division, purchased six branches of another bank, with approximately $96.8 million in deposits, including the branch at which the School's operating account was maintained, and from that date the School's account, its number and history unchanged, was an NBT Bank account, so that the account into which the tuition paid for Plaintiff's enrollment had been deposited since August 1999 became, with its deposit history, an NBT Bank account in the middle of Plaintiff's enrollment, and the tuition paid for the remainder of her enrollment, through June 2002, was, on information and belief, deposited with NBT Bank through its Pennstar Bank division and its Hancock office. NBT Bank's own statements to its stockholders describe the position from which it saw the School. In its investor materials NBT Bank reported that, as of June 30, 2010, it ranked first among all banks in

Delaware County, New York, where the School sat, with five branches and more than a quarter of all deposits in the county, and third in Susquehanna County, Pennsylvania, where the School's operating account was kept, with six branches and more than a fifth of the county's deposits; that in thirty of the communities it served it was the only bank in town; and that its strategic focus was organic growth, "particularly in the area of core deposits." When it formed Pennstar Bank from the Pennsylvania branches it acquired in 2000, its chief executive described the strategy as "maintaining the local decision making and high service levels that are essential elements of our community banking philosophy." On information and belief, consistent with those statements, decisions concerning the School's accounts and credit were made locally, by officers in the Hancock and Montrose offices who saw the School, its president, and its money directly, and the School's deposits were the kind of core deposits NBT Bank identified as its principal object of growth and the foundation of its lending. On information and belief, the bank's payroll ledger for the enterprise records every paycheck issued to Paul Geer from the 1990s through the 2014 closure, that is, for the entire period after FFS's administration had been told of Geer's confessed sexual misconduct with students and had decided to keep him; the bank processed and cleared those payments, held the record of them, and, after the 2024 indictment and the 2025 conviction publicly established what they had paid for, did not review, freeze, report, or otherwise act upon the accounts through which Geer had been paid or the accounts of the principals who had paid his. On information and belief, the bank likewise took no step, after the indictment or the conviction, to freeze, review, or report the accounts of Chapel Hill Land Holdings LLC, the transferee whose acquisition of the campus it had financed and on whose property the enterprise's surviving records had been concealed until recovered by federal search warrant, and did not call, terminate, or

withdraw the credit it had extended against that property, so that the bank remains today the financier of the entity that holds the enterprise's principal asset.

28. Defendant NBT Bancorp Inc. is the controlling parent of NBT Bank, N.A. and is named in that capacity.

29. From December 2, 2002 through December 18, 2021, without interruption, NBT Bank, N.A., directly and through Pennstar Bank, a division of NBT Bank, N.A., held one or more perfected security interests in the collateral of Education Plus Corporation. The public record shows blanket security interests filed against Education Plus Corporation in New York on December 2, 2002, January 30, 2004, May 30, 2006, and November 19, 2008, and in Pennsylvania on December 18, 2006; a security interest filed against Kasos Co Family LP on November 19, 2008; continuations filed on December 13, 2010, June 21, 2011, and October 31, 2013; the mortgage loan of March 24, 2010 to Kasos Co Family LP against the campus; the New York releases of December 12, 2014; and a Pennsylvania continuation filed on September 15, 2016. That secured position began six months after Plaintiff's departure, on collateral her labor and the labor of the children after her had built and maintained, and outlasted the school's closure by seven years.

30. On December 12, 2014, one month after Kasos Co Family LP conveyed the campus to Chapel Hill Land Holdings LLC, NBT Bank released its New York liens on the school's collateral. On February 27, 2015, NBT Bank filed a new blanket security interest against Chapel Hill Land Holdings LLC covering its equipment, fixtures, inventory, accounts, contract rights, general intangibles, timber, and oil, gas, and minerals, a lien that remained in force through February 27, 2020. On information and belief, NBT Bank's loan to Chapel Hill Land Holdings LLC funded the conveyance of the campus, and NBT Bank was repaid its own credit to the school from the proceeds of that conveyance.

31. On September 15, 2016, nearly two years after the school closed, NBT Bank renewed its blanket security interest in the collateral of Education Plus Corporation by continuation, so that NBT Bank held that lien every day through December 18, 2021. Under the Uniform Commercial Code a perfected security interest lapses five years after filing; it can be continued only by a continuation statement filed within the six months before lapse and only with the secured party's authorization; and absent that filing NBT Bank's lien would have ended on December 18, 2016. NBT Bank chose to continue it. On information and belief, NBT Bank collected interest, fees, and other charges on its secured credit throughout that period.

32. On information and belief, as of the filing of this action NBT Bank still holds the accounts of the Argiros family, of Kasos Co Family LP and Kasos Enterprises LLC, of K9-5 Inc., and of Chapel Hill Land Holdings LLC, and holds the proceeds of the enterprise's assets, and it has never terminated its relationship with the enterprise or its principals. On information and belief, NBT Bank placed no hold on any of those accounts and made no disclosure to any authority at the April 2024 indictment of Paul Geer, at the execution of the federal search warrant on the former campus, during the February 2025 trial, or upon the March 3, 2025 conviction, and has not provided its records of the enterprise to the federal authorities handling the Family Foundation School matter.

33. Defendant Sysco Syracuse, LLC is a Delaware limited liability company with its principal place of business in Warners, New York, and is the Sysco Corporation operating subsidiary whose central New York distribution territory includes Delaware County, New York. On information and belief, Sysco Syracuse, LLC distributed food and institutional supplies to FFS on a recurring, scheduled basis during the relevant period, delivering by truck to the FFS campus, and was paid for those goods and deliveries from the tuition-funded accounts described herein, while students at the institution, including, on information and belief, Plaintiff, unloaded those deliveries, and students,

including Plaintiff as the head of the institution's breakfast crew, prepared and served the food so delivered, as part of the uncompensated labor described herein. Defendant Sysco Corporation is a Delaware corporation with its principal place of business in Houston, Texas, and is the controlling parent of Sysco Syracuse, LLC, named in that capacity (together with Sysco Syracuse, LLC, "Sysco").

34. Defendant The Hancock Herald is the local newspaper serving the Village of Hancock, owned and controlled at all relevant times by Defendant Cindy Argiros, a principal of the enterprise, which published promotional content concerning FFS furthering the enterprise's fraudulent marketing of the school while not reporting the 1990 cease and desist order, the 2008 congressional oversight hearings into the institution held after Plaintiff's enrollment, or other matters of public concern regarding FFS's operation.

35. Defendant Village of Hancock, New York is a municipal corporation organized under the laws of the State of New York, sued individually and through the Village of Hancock Police Department ("Hancock PD"), the municipal police department owned, operated, funded, and controlled by the Village and through which the Village acted in the events described herein, including the standing practice of locating children who fled FFS and returning them to the institution's custody, on information and belief using the intake photographs the institution supplied to its officers.

36. Defendant Town of Hancock, New York is a municipal corporation organized under the laws of the State of New York, separate and distinct from the Village of Hancock, within whose borders the FFS campus at 431 Chapel Hill Road is located. At all relevant times, including during Plaintiff's enrollment, the Town exercised governmental authority over the territory on which FFS operated and possessed the official notice of FFS's unlicensed operation described herein, including, from December 2010, the joint findings of four New York State agencies that former students' accounts

of abusive practices were credible, yet permitted FFS to continue operating. Defendants NBT Bank, Chapel Hill Land Holdings LLC, the Hancock Herald, the Village of Hancock, and the Town of Hancock knew, or recklessly disregarded, what the School was, and each turned a blind eye to it because the relationship was profitable. The reasons were financial, and they were the town's. The campus was purchased, as the School's president testified at the 2025 Geer trial, with a down payment contributed by affluent members of the Hancock community, so that from its founding the School was an investment of the town's own money, made in a village that, on information and belief, was losing a tenth of its population in those years and had no other enterprise of its size to replace what it was losing. For the next quarter century the School's revenue, approximately $30,000 per child per year during Plaintiff's enrollment and far more thereafter, paid for by families from outside the town and deposited inside it, was one of the largest sources of payroll, purchasing, lodging, and patronage in a village of fewer than 1,200 people. A town that small, losing people, has one objective in its commerce, which is to keep what it has; and from 2006 forward the man charged with that objective was the man who ran the School. In 2006 Defendant Emmanuel Argiros joined the board of Hancock Partners, Inc., the economic-development corporation whose stated purpose is to combat community deterioration, served as its vice president and treasurer, and has been its president since 2022; he is also the treasurer of the Hancock Area Chamber of Commerce; and the Town of Hancock publishes both organizations' websites. The institutions whose function was to keep Hancock's commerce going were, from 2006, run by the owner of the commerce they were keeping, and the School was that commerce. Every other institution with a reason to look at the School had a larger reason to keep it open. NBT Bank held the School's deposits, lent against its receivables and its land, and could be repaid only if children kept arriving and parents kept paying; its benefit was not only the interest and fees it

earned for nineteen years on that credit, its payoff from the 2014 sale, and its loan to the buyer, but the relationship itself, which it chose to continue, through every notice event described herein, rather than lose the School's deposits, its credit, and the payroll and household accounts that depended on them. Chapel Hill Land Holdings LLC and the French Woods camp of Ronald Schaefer, who on information and belief is a principal of Chapel Hill, bought the campus below its assessed value and have charged campers to use the buildings the children built every summer since. The Hancock Herald, which Defendant Cindy Argiros ran under the name Cindy Ray, drew its advertising from the Argiros family's businesses and printed the School's promotional content rather than the complaints against it. The Village and the Town took the School's payroll, its purchasing, and its visitors as the local economy, and their police returned the children who ran. Each of those institutions saw the School from the inside: the bank saw the money come in and the collateral it was lent against, the Herald covered the campus, the buyer was a neighbor and friend of the family for many years, and the Village's own officers walked escaped children back through its gates. And the people who ran them sat at one table, under Defendant Argiros: NBT Bank is a member of the Chamber whose treasury he keeps and sponsors Hancock Partners, on whose board the manager of NBT Bank's Hancock branch, Dawn Joyce, and, on information and belief, Ronald Schaefer, sit under him. The knowledge of the branch manager who sat on the School president's board was the knowledge of NBT Bank, because she acquired it in the course of the very relationship the bank employed her to manage; and each Defendant, having that knowledge or recklessly disregarding it, chose the relationship over the children, through the 1990 cease and desist order, the 2008 congressional hearings, the 2010 findings of four State agencies, the 2014 closure and conveyance, the 2024 indictment, and the 2025 conviction. Nothing has changed since. On information and belief, as of the filing of this action, after the April 2024 federal indictment of a

longtime FFS staff member for crimes against FFS children, after the February 2025 public trial at which the School's president admitted under oath that its records had been destroyed, after the March 3, 2025 conviction, and after the commencement in 2026 of more than twenty actions in this District alleging the conduct described herein against the same Defendants, Defendant Emmanuel Argiros remains the treasurer of the Hancock Area Chamber of Commerce and the president of Hancock Partners, Inc.; NBT Bank remains a member of the Chamber and a sponsor of Hancock Partners, its branch manager remains a director under him, and it remains the holder of the accounts described herein and the lender to the entity that holds the campus; the French Woods interests remain on that board and in operation on the campus; and no Defendant has suspended, removed, or disassociated from any of them, called or withdrawn any credit, closed any account, or disclosed anything to any authority.

37. Defendant Delaware County Sheriff's Office is the law enforcement agency for Delaware County, New York, in which FFS is located, and Defendant Delaware County Board of Supervisors is the governing legislative body of Delaware County. Defendant County of Delaware, New York ("the County") is a municipal corporation organized under the laws of the State of New York, within whose borders the FFS campus operated throughout the relevant period and which is the entity liable for the customs, policies, and practices of the Sheriff's Office and Board of Supervisors alleged herein.

38. Defendant National Association of Therapeutic Schools and Programs ("NATSAP") is a national membership and accreditation organization for therapeutic boarding schools and residential treatment programs, including FFS, which was a founding member of NATSAP. NATSAP accepted FFS as a founding member, lent FFS the institutional legitimacy of its membership designation, and published and promoted FFS's membership in its directories and

marketing materials, which were used by parents, by education consultants, and by referring programs, as evidence that FFS met recognized standards for therapeutic residential programs. NATSAP received membership dues from FFS throughout the period of FFS's membership and knew or should have known that FFS operated without the licenses, credentials, and professional staff its membership status implied it possessed.

39. Defendant Lackawanna College is a private college organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 501 Jefferson Avenue, Scranton, Pennsylvania. During Plaintiff's enrollment, Lackawanna College offered college-credit courses on the FFS campus, taught, in part, by FFS staff members, including the English and social studies courses in which Plaintiff was enrolled in her final period, taught in part by FFS staff members Jan Cheripko and Michael Ducey, and charged and received payment for those courses from the families of FFS students, including Plaintiff's parents, who were billed for them separately from tuition. Lackawanna College thereby received recurring payment from the operation described herein and lent it the legitimacy of an accredited college's coursework, on which placing families relied and which the institution used to represent to Plaintiff's parents that doubled coursework was the means by which their daughter would graduate on time, while its courses were delivered on the campus by the institution's own staff, who observed and administered the conditions described herein. No credit Plaintiff earned through those courses was accepted by any college. Lackawanna College knew or should have known, through the staff who taught its courses on the campus and through the institution's public record, of the nature of the operation from which it was receiving payment, and is named as a knowing beneficiary of and participant in that operation.

40. Rita Argiros, who died in 2015 and is not named as a defendant in this action, was the daughter of FFS's founders, the sister of Defendant Emmanuel Argiros, and the daughter of Defendant Betty Argiros. In 2000, during Plaintiff's enrollment, Rita Argiros became the Executive Program Director of FFS, a role in which, by her own published account, she reshaped the practices and procedures of the school, and in which she held authority over the sanction, labor, isolation, and food regime imposed upon Plaintiff, and she founded the school's canine program, known as the Dog Corps, which she ran with the unpaid labor of FFS students. Rita Argiros was simultaneously the founder and president of the search dog organization named in the following paragraph. Her conduct is alleged as conduct of the enterprise and of Education Plus Corporation.

41. Defendant Eagle Valley Search, Rescue and Recovery Team, Inc., doing business as Eagle Valley Search Dogs ("Eagle Valley"), is a New York not-for-profit corporation with a principal place of business in Wurtsboro, New York, founded and presided over by Rita Argiros. Upon information and belief, throughout Plaintiff's enrollment the enterprise's canine operation and Eagle Valley's operation were conducted in common by the same Argiros family principal; the unpaid labor of FFS students, who walked, fed, cared for, and served as training subjects for the school's dogs, supported the care, maintenance, and training of dogs from which Eagle Valley's operation benefited; the kitchen, grounds, and custodial labor of the student body as a whole, including Plaintiff's, ran the institution within which that canine operation was housed, fed, and maintained; and Eagle Valley thereby maintained, through its own founder and president, a continuous relationship with the enterprise, knew, through her, of its nature, and knowingly benefited from the forced labor of the children in its custody.

42. Jan Cheripko, who died in 2024 and is not named as a defendant in this action, was employed for ten years, from 1990 to 2000, by Boyds Mills Press, the book publishing arm of the Highlights

organization, during a period in which he was also involved at FFS as a part-time English teacher; joined FFS full-time in 2000, during Plaintiff's enrollment; served as an FFS English teacher and, from approximately 2001, as a family leader; and remained at FFS until June 2013, while remaining a Boyds Mills author; Cheripko was among the FFS staff members who taught the college-credit courses in which Plaintiff was enrolled and for which her parents were separately billed. Through Cheripko, the publishing organization named in the following paragraph was embedded in the purported education the enterprise sold to paying families and had, in its own longtime employee and author, direct knowledge of the institution's practices.

43. Defendant Highlights for Children, Inc. and Defendant Boyds Mills (formerly the Highlights Foundation) (together, the "Highlights Defendants") are affiliated entities that publish the Highlights magazines and operate, among other things, a retreat property of approximately 1,300 acres in Wayne County, Pennsylvania. The January 2026 renaming of the Highlights Foundation as Boyds Mills reflects an unbroken continuity of the same entity. The Highlights Defendants' publications and programs were integrated into the purported education for which the enterprise's families, including Plaintiff's, paid: upon information and belief, FFS purchased Highlights publications for use in the school's purported educational program with tuition-funded money, so that a portion of the tuition extracted from the enterprise's families flowed directly to the Highlights Defendants; the uncompensated forced labor of the children subsidized the operation from which those payments were made; and, on information and belief, FFS students were brought to the Highlights Defendants' Wayne County retreat, where they performed uncompensated labor from which the Highlights Defendants benefited. The Highlights Defendants thereby knowingly benefited, financially and by receiving things of value, from a venture engaged in forced labor, labor trafficking, and sex trafficking as alleged herein, and knew or should have known, through

Cheripko, their own longtime employee and author embedded on the campus, of the nature of that venture.

## FACTUAL ALLEGATIONS

### A. The Family-Unit Structure and Institutional Control

44. When Plaintiff arrived at FFS in August 1999, the school's population was divided into several "family" units, each housed and supervised separately. Plaintiff was assigned to Family One, under family heads Robin Ducey and Michael Ducey, agents of the School, and remained in that unit, in their custody and under their control, throughout her enrollment. FFS's institutional structure vested near-total control over students' daily lives, movement, and contact with their families in the family-unit staff, a structure that both enabled and concealed the conduct described herein.

45. Control was enforced through a system of "sanctions," punishments imposed at the discretion of staff, including, in Plaintiff's case, work sanctions, confinement to a corner, enforced silence, food restriction, and the withholding of privileges and of contact with her family, each of which set a student back in "the program," so that each sanction extended the time the student would remain at the school and the tuition and charges the institution would collect for her. The students lived in constant fear of being singled out for sanction, a fear FFS cultivated deliberately and used as its principal instrument of control.

### B. Recruitment, Transport, and the Financial Arrangements

46. Plaintiff was placed at FFS through the referral of an educational consultant retained by her parents. FFS marketed itself to placing families and to the consultants who referred to it through its promotional materials and representations that it was a qualified therapeutic institution staffed to provide psychiatric, psychological, and therapeutic treatment to adolescents with the conditions for which Plaintiff was placed there. Plaintiff's parents relied on those representations in placing

Plaintiff at FFS and in paying tuition and charges to Defendants of, on information and belief, approximately thirty thousand dollars per year, approximately ninety thousand dollars over the three years of her enrollment, by checks and payments transmitted from Westchester County through the United States mail.

47. In addition to tuition, FFS billed Plaintiff's parents separately for the college-credit courses described herein, and, on information and belief, for incidentals, laundry, toiletries, and the trips described herein, including the Toronto, Washington, D.C., Virginia, and Pennsylvania trips, charges that, consistent with the institution's billing practices as established by evidence at the 2025 federal criminal trial described herein, were a systematic feature of the institution's extraction of money from the families of the children in its custody.

48. Plaintiff did not go to FFS willingly. She was taken from her home in Chappaqua in August 1999 by off-duty or retired police officers engaged as escorts, an arrangement that FFS recommended to placing parents and, on information and belief, arranged for them, and she was delivered into the institution's custody in Hancock in their charge. FFS had arranged her enrollment and its financial terms with her parents in advance. From that day until June 2002, Plaintiff remained in FFS's custody and control, on a campus from which she could not leave, with her contact with her parents monitored, rationed, and withheld as a sanction.

**C. Compelled Strip Search and Photography**

49. Immediately upon her arrival at FFS in August 1999, Plaintiff, then fourteen years old, was strip searched pursuant to FFS's intake policy, without medical screening, parental consent, or lawful authority: she was required to remove all of her clothing and, while naked, to remove the ring from her tongue and display it. The search was not the admission of a student but the booking of an inmate, and it was the institution's first lesson to the child now in its custody. On information

and belief, and consistent with the uniform institutional practice applied to every child admitted to FFS, Plaintiff was photographed on self-developing instant film in the course of that intake and before she had been permitted to dress, and the photograph was placed directly into a book maintained by the institution.

50. On information and belief, FFS photographed every student at or shortly after intake, photographing students from the chest up as a baseline and photographing the entire body of any student who bore a tattoo, scar, or other distinctive mark, including students who were photographed naked. The images were captured on self-developing instant film and placed directly into books that the institution maintained and retained, and that remained in its possession and control through at least FFS's 2014 closure. FFS sent its ordinary student photography, including student journalism and activity photographs, to commercial photographic developers in the Village of Hancock for processing, but never sent the images of unclothed students to any outside developer, confining those images to a self-developing format and to the institution's own books so that no person outside the institution would see them.

51. On information and belief, FFS supplied copies of students' intake photographs to local law enforcement, including Hancock PD and the Delaware County Sheriff's Office, as part of a standing arrangement under which officers used the institution's photographs to locate students who fled the campus and to return them to the institution's custody, and officers did use the institution's photographs for that purpose during the period of its operation.

**D. The Denial of Therapeutic and Medical Care**

52. FFS accepted Plaintiff with knowledge that she had been diagnosed with an attention disorder, had been prescribed Adderall and Ritalin, and had been under the intermittent care of a therapist and a psychiatrist, and represented that it would treat her. FFS employed no psychologist,

psychiatrist, or physician on its staff. Plaintiff never took her prescribed medication at FFS; the institution discontinued it without any evaluation by a physician, and on information and belief the discontinuation was effected by agents of the School, including its nurse, and not by any physician. During her nearly three years of enrollment, the only medical personnel Plaintiff saw on the campus was a nurse, Jennifer Becker, and she was never seen by a psychiatrist, psychologist, licensed therapist, or physician there. As the institution's president, Defendant Emmanuel Argiros, admitted under oath at the 2025 federal criminal trial described herein, he was neither a clinical psychologist nor a certified teacher, his parents, the institution's founders, had no training in pedagogy, and the institution nonetheless marketed itself as a therapeutic boarding school.

53. The one physician Plaintiff saw during her enrollment was a gynecologist in Binghamton, New York, to whom the institution took her off the campus and whose identity is within Defendants' records. No mental-health professional evaluated, treated, or monitored Plaintiff at FFS at any time, and no licensed medical professional evaluated the discontinuation of her medication or its effects. The prayer services, confrontation groups, and table topics FFS substituted for treatment were not treatment.

**E. Forced Labor**

54. Throughout her enrollment, Plaintiff performed uncompensated institutional labor that was neither incidental to nor part of any genuine therapeutic or educational program, every assignment of which was performed under threat of sanction, hunger, the extension of the duty itself, and the loss of contact with her parents. Plaintiff was assigned to kitchen duty and became the head of the institution's breakfast crew, responsible for cooking breakfast for the student body and staff each morning without any staff member supervising the crew; to the evening dishwashing crew; to laundry duty; to snow shoveling, including the shoveling of the campus walkways before chapel;

and to “general inspections,” the cleaning and inspection of the institution’s buildings and grounds. As a “rock sanction,” Plaintiff was made, in February, for three to four hours a day for approximately two weeks, to carry buckets of rocks from one place to another, labor whose only product was the child’s exhaustion. On the institution’s retreat trips described herein, Plaintiff was made to clean and to wash dishes at the retreat house. This labor, imposed on a minor in Defendants’ custody and substituted for the treatment and education for which her parents were paying, was uncompensated labor extracted from a child under the threat of sanction and continued confinement.

55. FFS used the children in its custody to perform its institutional functions: a fourteen- to seventeen-year-old girl ran the institution’s breakfast kitchen, without a paid cook or a supervising adult, for the entire resident population, and the children washed the institution’s dishes, did its laundry, cleared its walkways, and inspected and cleaned its buildings. Those were the functions a lawful residential school must staff and pay for; FFS staffed them with the children whose families it was charging tens of thousands of dollars a year, displacing the wages the institution would otherwise have had to pay for kitchen, laundry, custodial, and grounds staff.

56. Among that labor, FFS assigned students to its kitchen, where Plaintiff was assigned on kitchen duty and headed the breakfast crew. In that capacity, Plaintiff drew the institution’s food from its walk-in coolers and refrigerators and prepared and served the goods delivered to the institution by its commercial food distributor, Sysco, whose delivery trucks Plaintiff saw on the campus, and, on information and belief, she was among the students who received and unloaded those deliveries. On information and belief, Sysco’s drivers and delivery personnel returned to the campus on a regular delivery schedule and observed minor children performing the labor of receiving, unloading, storing, preparing, and serving its deliveries, and the volume and composition of the

food FFS ordered from Sysco was materially inconsistent with the adequate feeding of the resident child population its personnel observed, a fact reflected in Sysco's own order, invoice, and delivery records. Sysco thereby received throughout the relevant period both recurring tuition-funded payment for its goods and the direct benefit of unpaid child labor in the handling, preparation, and service of the goods it supplied.

**F. Food Deprivation, the Corner, Table Topics, and the Censorship of Family Contact**

57. FFS used food as an instrument of control. When Plaintiff was on sanction, she was fed only tuna fish or Maypo, and if she did not eat it, the same food was put in front of her at the next meal until she did. In her second week at the institution, at fourteen, Plaintiff spoke back to a member of the kitchen staff and was placed in a corner, in enforced silence; her parents, who did not know, sent her a cake, and she was not permitted to eat it. The corner and enforced silence were imposed on her repeatedly during her enrollment.

58. FFS subjected Plaintiff, an adolescent girl, to sexual material and sexualized humiliation as part of its program. At the institution's "table topics," the sessions at which students were required to speak and to listen to the confessions of others, Plaintiff, then a minor, was made to sit through a member of her family unit's account of having sex with sheep.

59. FFS's control of the girls in its custody was directed at their bodies as female adolescents: the intake search that made a fourteen-year-old girl strip and remove her tongue ring while naked before staff, and the exposure of a minor girl to sexual material at the table. Together with the food and labor practices described herein, these practices formed a regime of institutional control directed at Plaintiff's body and sexuality as a female adolescent.

60. FFS staff limited, monitored, and censored students' contact with their families. FFS's Handbook required that all outgoing student mail be read and initialed by a staff mentor and all

incoming mail be read by staff, barred any telephone contact for the first month of enrollment and thereafter limited students to staff-dialed calls of a few minutes each, and authorized mail and phone blackouts as sanctions, so that Plaintiff's parents never observed the ordinary conditions of her confinement.

**G. Isolation, Restraint, and the Corner**

61. Plaintiff was made, as a sanction, to spend extended periods standing in a corner in enforced silence, forbidden to speak and unacknowledged by the other students, beginning in her second week at the institution at fourteen years of age. During Plaintiff's enrollment, FFS staff and senior students acting at staff direction also physically restrained students by wrapping them in blankets or rugs and binding them, the practice that the institution, in its May 2008 public response to congressional oversight, characterized as a benign safety measure modeled on first aid for seizures, and confined students overnight in isolation under the watch of staff or senior students.

62. While Plaintiff was in the corner or on work sanctions, she received no schooling; the sanctions regime displaced her education for substantial portions of her enrollment.

63. As established by evidence at the 2025 federal criminal trial described herein, including the institution's own enrollment agreement and the trial testimony of Defendant Emmanuel Argiros, FFS billed the families of the children it isolated overnight a charge of $150 per night for that confinement, entered on the institution's billing under the description "night watch," a description that did not disclose to the families what the charge was for, so that the institution charged families for the isolation of their children while concealing from them what they were paying for. On information and belief, that billing practice was in force throughout Plaintiff's enrollment and was applied to the families of the children isolated and restrained in Plaintiff's family unit and across the institution.

64. FFS carried the labor it extracted from Plaintiff and the sanctions it imposed on her on its records as its program, and represented to her parents that she was receiving treatment and instruction. She was not. Plaintiff had arrived at FFS with a ninth-grade year to make up, and the institution represented to her parents that doubled college-credit coursework was the means by which she would graduate on time. To graduate Plaintiff on schedule notwithstanding that year and the instruction the institution's own sanctions had cost her, FFS in her final period doubled her enrollment in college-credit courses offered through Lackawanna College, in English and social studies, for which it billed her parents separately, and which were taught, in part, by FFS staff members, including Jan Cheripko and Michael Ducey. No college ever accepted those credits, and no credit earned at FFS transferred to the college Plaintiff later attended.

**H. The Institution's Trips and Plaintiff's Transport Beyond the Campus**

65. During her enrollment, FFS transported Plaintiff, a minor in its custody, out of the State of New York and out of the United States on the institution's recurring trips: to Toronto, Ontario, Canada; to Washington, D.C.; to Busch Gardens, in Virginia; and to a retreat house in Pennsylvania conducted by a priest known to the students as Father Steven, at which the students were held in silence and prayer, made to clean and wash dishes, and kept overnight. Those trips were organized and supervised by FFS staff, in whose custody Plaintiff traveled, and the trips to Toronto were led by Defendant Paul Geer, the staff member FFS kept in charge of its trips off the campus notwithstanding his confessed sexual misconduct with students.

66. As established by Defendant Geer's conviction on March 3, 2025, the institution's recurring trips beyond the campus were the occasions on which he transported FFS students across state and international lines for the purpose of criminal sexual activity, including a trip to Toronto in 2001, during Plaintiff's enrollment, organized and supervised by Geer in the same period and of the same

kind as the trips on which Plaintiff was transported. Plaintiff, a minor in the institution's custody, had no ability to refuse the trips or the transport, and on each trip she remained subject to the same rules, sanctions, and control as on the campus, and FFS returned her from each to the campus and to the regime described herein.

**I. Plaintiff's Education and the Cost of the Placement**

67. Plaintiff entered FFS at fourteen, at the start of her high school years, and spent nearly three years there, during which she received no education of substance: she was removed from instruction for the sanctions and labor described herein for substantial portions of her enrollment, and was then run through doubled college-credit courses, at her parents' additional expense, so that the institution could issue her a diploma in June 2002. Plaintiff graduated from FFS in June 2002 and thereafter attended college. No credit she earned at FFS, including the Lackawanna College credits for which her parents had paid, transferred. FFS's tuition and charges for those three years, on information and belief approximately ninety thousand dollars together with the separately billed course charges, were paid by her parents for a placement that FFS represented as therapeutic and educational and that was neither, and FFS retained all of it.

**J. FFS's Documented Unlicensed Operation and Pattern of Concealment**

68. FFS's unlicensed and abusive operation was a matter of public record throughout Plaintiff's enrollment: in August 1990, the New York State Division of Alcoholism and Alcohol Abuse issued FFS a formal, public cease and desist order for operating without the license required by New York law. Defendants continued to operate, enroll, and confine children, including Plaintiff beginning in August 1999, notwithstanding that order, without disclosing it to Plaintiff's family or to the consultant who referred her. In 2008, after Plaintiff's enrollment, the practices of FFS were the subject of oversight hearings before the United States House of Representatives Committee on

Education and Labor, to which the institution publicly responded, through Defendant Brain, by characterizing its restraint and sanction practices as benign and marketing itself as a reformed and rigorous program, while the former students it had abused, including Plaintiff, and their families remained deceived as to what had been done to them. In 2010, following complaints by former students, the New York State Commission on Quality of Care and Advocacy for Persons with Disabilities, the Office of Mental Health, the Office of Alcoholism and Substance Abuse Services, and the State Education Department jointly investigated FFS, including a site visit in June 2010 and written correspondence with FFS in September and October 2010, and on December 29, 2010 the four agencies wrote jointly to Defendant Emmanuel Argiros, as President of FFS, stating their finding that the accounts of former students spanning approximately 2000 through 2010, a period encompassing Plaintiff's enrollment, concerning abusive practices at the institution were credible and strikingly similar to one another, and noting a 2008 visit by an accrediting body after which practices the agencies described as formerly punitive had rapidly changed. Defendants continued to operate, enroll, and confine children for four more years. Those findings concerned the treatment of children; they did not disclose, and no state agency has ever disclosed, the financial structure of the enterprise, who profited from it, or the participation of the institutional Defendants named herein.

69. Throughout and after Plaintiff's enrollment, FFS staff limited, monitored, and censored students' contact with their families, preventing full disclosure of the true conditions of confinement. On information and belief, and as later confirmed by testimony in the 2025 federal criminal trial of Paul Geer, the Argiros family, and Defendant Emmanuel Argiros as the custodian of the institution's records, deliberately destroyed student records, abuse complaints, and other

institutional documentation, directly depriving Plaintiff and other former students of the evidentiary record necessary to discover and assert their claims.

**K. Discovery of the Enterprise**

70. Plaintiff always knew that she had been mistreated at FFS. What she did not know, and could not have known, was what her mistreatment was part of: that the institution was an enterprise that would operate for twelve years after she left on the same methods; that the staff member who led the trips on which she was transported out of the country was transporting other children on those trips for sexual purposes; that the institution was billing families for the overnight isolation of their children; that the institution's records would be destroyed; and that the tuition her parents paid was part of the revenue of an operation that profited from children for a quarter century and that its bank financed against the product of the children's labor. Plaintiff did not discover any of that until the disclosures made in and around Paul Geer's 2025 federal criminal prosecution and trial. It was the evidence and testimony adduced at that public trial that first revealed to her the enterprise's decades-long pattern of institutional concealment, the destruction of records, the institution's practice of billing families for the isolation of their children, the admission of its president that it employed no clinical professionals, the criminal purpose of the trips on which she herself was transported, and the coordinated participation of the individual and institutional Defendants named herein, and that gave rise to the filing of this action. A child in the enterprise's custody, taught that she was the one in the wrong, could not have discovered what the United States did not establish until it indicted an FFS staff member in 2024 and tried him in 2025, and what no regulator, court, or law enforcement agency had established in the nine years before Plaintiff's enrollment, during the congressional hearings and State investigation that followed it, or in the twelve years of the enterprise's operation after she left.

**L. Injuries and Damages**

71. As a direct and proximate result of Defendants' conduct described herein, Plaintiff has suffered severe and lasting injury, including but not limited to: the strip search inflicted upon her at intake and, on information and belief, the photographing of her and the institution's retention of that image; the loss of nearly three years of her education and of every credit her parents paid for; the loss of the tuition and charges paid on her behalf; the value of nearly three years of uncompensated labor; the discontinuation of her prescribed medication and the years of untreated illness that followed; post-traumatic stress disorder, for which she has treated with two therapists over a period of years and by reason of which she has taken periods of leave from her employment; the impairment of her capacity to form and sustain relationships; and injury to her business and property resulting from that psychiatric injury, namely the loss in 2018 of her fifty percent ownership interest in a business that grossed approximately one million two hundred thousand dollars per year and of the income from it, the closure of the retail business she had founded and operated, which had reached three hundred sixty thousand dollars in revenue in its second year, and the loss of her home, valued at approximately one million dollars; together with continuing physical, emotional, and psychological injury, pain and suffering, humiliation, and loss of enjoyment of life, for which she requires continuing care.

72. Plaintiff's condition did not run its course and resolve; it was aggravated by each public revelation about the institution. In 2017 and 2018, former FFS students publicly circulated accounts of their treatment at the institution and organized among themselves, and the New York Legislature publicly debated the Child Victims Act, legislation to revive the time-barred claims of adults who had been abused as children, which the Governor proposed and the Assembly passed in 2018 before its enactment in February 2019. That public attention to the claims of survivors of

childhood abuse, and the accounts of other FFS students then circulating, brought Plaintiff's confinement at FFS back upon her, and her condition worsened in that year: her treatment intensified in 2017 and 2018, and it was in 2018 that she lost her ownership interest in the business, closed the retail business she had founded, and lost her home. By 2018 the condition had destroyed the personal relationship within which Plaintiff's business interest, her retail business, and her home were held and run, and the loss of each followed from that collapse; the impairment of her capacity to sustain relationships is itself an injury Defendants caused, and the financial losses that flowed through it are losses by reason of Defendants' conduct. Plaintiff's psychiatric injury was further aggravated by the April 2024 federal indictment of Paul Geer, by the February 2025 public trial, and by the disclosures made there concerning the criminal purpose of the trips on which she herself had been transported and the billing of families for the isolation of their children, and her need for treatment has increased since those disclosures. The public attention of 2018 concerned the abuse of children; it did not disclose, and nothing available to Plaintiff before 2025 disclosed, the enterprise, its finances, its bank, or the criminal purpose of its trips, on which the claims pleaded herein rest.

## <u>TOLLING OF STATUTES OF LIMITATIONS</u>

73. Plaintiff's claims arising from conduct constituting a sexual offense, the use of a child in a sexual performance, or abuse or degrading treatment committed against her while a minor, including the strip search and, on information and belief, the photographing of Plaintiff described herein, and her claims for battery, false imprisonment, and intentional infliction of emotional distress described herein, are timely pursuant to CPLR 208(b), which extends the infancy toll applicable to such claims until the victim's fifty-fifth birthday.[1] Plaintiff was born in September

[1] Plaintiff asserts no claim under CPLR 214-g. The revival window established by the Child Victims Act closed before this action was commenced. Should the Legislature reopen or extend that revival window, or enact

1984, and is presently forty-two years of age; her claims are accordingly timely on this independent ground alone, without regard to any other tolling doctrine set forth below.

74. Plaintiff's RICO claims are timely. Plaintiff did not discover the true nature of the racketeering enterprise until the disclosures made in and around Paul Geer's 2025 federal criminal prosecution and trial, and the limitations period began to run, at the earliest, upon that discovery; it was the evidence and testimony adduced at that public trial that first revealed the coordinated, institutional, and enterprise character of the conduct. Plaintiff, a child in the enterprise's custody from fourteen to seventeen years of age, could not have discovered what the United States did not establish until it indicted an FFS staff member in 2024 and tried him in 2025, and what no regulator, court, or law enforcement agency had established in the nine years before Plaintiff's enrollment or the twelve years of the enterprise's operation after it. Independently, all applicable limitations periods are tolled by Defendants' fraudulent concealment, the self-concealing nature of the conspiracy, and the overt acts of concealment committed in furtherance of the conspiracy within the limitations period, as set forth below.

75. Plaintiff's claims under 18 U.S.C. §§ 1589, 1590, 1591, and 1595 arising from her enrollment, which continued for approximately twenty months after those provisions took effect on October 28, 2000, through June 2002, and from the continuing receipt of the benefits of that enrollment and of the venture's operation alleged herein, are timely under 18 U.S.C. § 1595(c), together with discovery-based accrual and the fraudulent-concealment, equitable-estoppel, and self-concealing-conspiracy grounds set forth herein. Plaintiff's claims under 18 U.S.C. § 1595 for the obstruction of enforcement alleged herein arise from continuing violations, each of which has continued through the 2024 federal indictment and March 3, 2025 conviction of Paul Geer and through the filing of

comparable revival legislation, Plaintiff reserves the right to seek leave to amend this Complaint to assert all claims thereby revived.

this action, and each month of which constitutes a fresh act within the limitations period. Plaintiff's claims under 18 U.S.C. § 2255 are subject to no limitations period, the Eliminating Limits to Justice for Child Sex Abuse Victims Act having eliminated the statute of limitations for § 2255 claims not already time-barred as of September 16, 2022, and Plaintiff's claims, subject to discovery-rule accrual, were not time-barred as of that date.

76. Independently and alternatively, all applicable statutes of limitations are tolled on each of the following independent grounds:

(a) Fraudulent Concealment. Defendants engaged in a coordinated scheme of affirmative concealment including: (i) FFS staff limited, monitored, and censored students' contact with their families, including through the reading and censorship of outgoing and incoming mail and the limitation of telephone contact described in FFS's own Handbook; (ii) Defendants continued to operate FFS notwithstanding the 1990 cease and desist order, without disclosing that order to Plaintiff's parents or to the consultant who referred her; (iii) FFS represented to Plaintiff's parents that Plaintiff was receiving therapeutic treatment and instruction, when she was receiving the corner, the sanctions, and the kitchen, and taught Plaintiff herself that she was the one in the wrong; (iv) FFS billed families for the overnight isolation of their children under a description that did not disclose what the charge was for; (v) the institution, through Defendant Brain, publicly minimized and mischaracterized its practices in its May 2008 response to congressional oversight hearings, and, through Defendant Emmanuel Argiros, responded to the 2010 state investigation while continuing to operate as before; (vi) on information and belief, the Argiros family deliberately destroyed student records, abuse complaints, and institutional documentation, as confirmed by testimony at Geer's federal criminal trial, directly depriving Plaintiff of the evidentiary

record necessary to discover and assert her claims; and (vii) on information and belief, the institution retained and never disclosed the intake photographs it took of Plaintiff and other students. Plaintiff did not and could not through reasonable diligence have discovered the full scope of the enterprise within any applicable limitations period. Plaintiff's knowledge that she herself had been mistreated is not knowledge of the facts on which these claims rest: that the institution was an enterprise, that its trips were the occasions of its trip leader's crimes, that it billed families for isolating their children, that its records were destroyed, and that its bank financed it against the product of the children's labor. Those facts were concealed from her, and from everyone outside the enterprise, until 2025.

(b) Self-Concealing Conspiracy. The enterprise was structured to prevent victims from connecting their individual experiences to the broader enterprise. Its mechanisms of isolation, including the censorship of family contact described herein, the instillation in students of the belief that they themselves were in the wrong, which Plaintiff carried for years after her release, and the use of staff and local law enforcement to return students who fled, were themselves instruments of concealment rendering victims, including Plaintiff, structurally incapable of discovering the enterprise during enrollment or for years thereafter.

(c) Overt Acts Within the Limitations Period. The destruction of student records by the Argiros family, as established by testimony at Geer's 2025 criminal trial, constitutes an overt act in furtherance of the conspiracy committed within the limitations period. The below-market transfer of the FFS real property by Kasos Co Family LP to Chapel Hill Land Holdings LLC in November 2014, the further transfer of an additional parcel by Defendant Emmanuel Argiros to Chapel Hill Land Holdings LLC in June 2016, and the 2014

incorporation of K9-5 Inc. immediately upon FFS's closure, each constitute further independent overt acts of asset disposition and concealment in furtherance of the conspiracy falling entirely within the limitations period. The continued concealment on the former campus property of the institutional records that survived the destruction, described herein, constitutes a further overt act of concealment in furtherance of the conspiracy continuing within the limitations period.

77. Plaintiff's claim under N.Y. Social Services Law § 483-bb is timely on the grounds set forth in Count V below, including CPLR 212(e).

78. Common-law fraud and negligent misrepresentation. Plaintiff's claims are timely under CPLR 213(8), which permits an action to be commenced within the greater of six years from the fraud or two years from discovery. The two-year discovery period runs from the discovery described above, and this action is timely under both measures.

79. All applicable statutes of limitations on Plaintiff's negligence, negligence per se, and 42 U.S.C. § 1983 claims are independently tolled by the fraudulent concealment and equitable estoppel doctrines set forth above, in addition to CPLR 208(b) as set forth above.

80. Defendants are estopped from asserting any statute of limitations defense. A defendant cannot invoke the protection of a limitations period that its own wrongful conduct caused the plaintiff to miss.

## COUNT I: CIVIL RICO (18 U.S.C. § 1962(c))

**(Against All Defendants)**

81. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**The Enterprise.**

82. At all relevant times, Defendants constituted an enterprise within the meaning of 18 U.S.C. § 1961(4), as an association-in-fact that operated through the FFS institution as its vehicle but was structurally distinct from any individual defendant. The enterprise existed as an ongoing organization with its own staff hierarchy, marketing apparatus, referral network, physical campus, and financial infrastructure that persisted independently of any particular predicate act, and operated as a continuing unit for decades, including throughout Plaintiff's 1999-2002 enrollment.

83. Each Defendant knowingly participated in the conduct of the enterprise's affairs. FFS and Defendant Betty Argiros owned, operated, and directed the enterprise, made the decisions regarding staffing, student control, and continued operation notwithstanding the 1990 cease and desist order, and financially benefited from every aspect of the enterprise's operation. Defendant Emmanuel Argiros, as president of the FFS board throughout Plaintiff's enrollment and, on information and belief, the custodian of its records, and Defendant Cindy Argiros, who taught Plaintiff and, on information and belief, participated in the administration of the institution's sanction, labor, and food regime, directed the institution's operation and the forced-labor and sanction practices described herein and participated in the conduct of the enterprise's affairs at the institutional level. Through its family-unit staff, including the family heads of Plaintiff's unit, Education Plus Corporation administered the labor, sanction, and food regime imposed upon Plaintiff, discontinued her prescribed medication, conducted the intake strip search described herein, exposed her to sexual material at its table, billed families for the overnight isolation of their children under a description that concealed what the charge was for, and returned to its custody the children who fled it. Defendants NBT Bank, N.A. and NBT Bancorp Inc. knowingly and purposefully participated in the conduct of the enterprise's affairs, not as a passive depository but

as the enterprise's secured lender. The bank extended secured credit to the enterprise and its property-holding entity, including the security interests taken from both the operating corporation and its title-holding entity on November 19, 2008, months after the congressional hearings, and took as its collateral the fruit of the children's forced labor: the tuition receivables and enrollment contracts, including Plaintiff's, the inventory the children unloaded, handled, and prepared, the equipment and improvements they built and maintained, and, from March 24, 2010, the campus itself, whose upkeep was the children's daily labor. Having taken that collateral, the bank held a direct financial stake in the continuation of the operation and in the continued confinement of the children in it, because without enrolled children there was no tuition to repay it and without children to house and to labor there was no operating campus to secure it; and the bank acted on that stake, continuing and renewing its credit in 2002, 2004, 2006, 2008, 2010, 2011, 2013, and, by continuation nearly two years after the school closed, 2016, holding its lien on the enterprise's collateral every day through December 18, 2021, inspecting and appraising, on information and belief, the very campus on which the children's labor was open and visible, processing every tuition deposit, payroll check, and disbursement of the enterprise through its Village of Hancock branch, including tuition paid on Plaintiff's behalf, financing the 2014 conveyance by which the enterprise's principal asset was moved beyond the reach of its victims and collecting its own payoff from it, and taking the transferee as a new lending customer, all while disregarding the public record of FFS's unlicensed operation and the knowledge that its own underwriting, collateral inspections, and ledgers supplied, and while taking no corrective action of any kind following the 2024 indictment and 2025 conviction of Paul Geer. That course of conduct was a choice, repeated at each renewal and each notice event, to keep the operation running because the bank's collateral and its repayment depended on it. Defendant Sysco, on information and belief, advanced and

benefited from the enterprise by serving as its recurring institutional food distributor while its own personnel observed minor children, including, on information and belief, Plaintiff, unloading its trucks and handling and preparing the food it supplied. Defendant Lackawanna College advanced and benefited from the enterprise by delivering college-credit coursework on the FFS campus through FFS staff, including the courses in which Plaintiff was enrolled and for which her parents were billed separately, and by lending the enterprise the legitimacy of accredited coursework on which placing families relied. Defendant NATSAP lent membership legitimacy to FFS's fraudulent marketing representations. The Hancock Herald contributed to the enterprise's fraudulent marketing of FFS to the public. Defendant Jeffrey Brain participated in the conduct of the enterprise's affairs by directing the enterprise's admissions, its external relations, and its public representations, including the May 2008 public response to congressional oversight described herein, continuing the enterprise's fraudulent marketing and maintaining the concealment on which its continued operation depended, and by drawing his compensation for years from the proceeds of that operation. The Village of Hancock, Town of Hancock, County of Delaware, Delaware County Sheriff's Office, and Delaware County Board of Supervisors, upon information and belief, participated in and enabled the enterprise's continued operation and concealment by permitting FFS to operate without proper licensure notwithstanding the 1990 cease and desist order and by locating children who fled FFS and returning them to its custody without inquiry, and, pleaded in the alternative, benefited economically from the enterprise's continued operation, which brought into their communities the payroll of local residents employed by the institution, the patronage of visiting families, and the institution's recurring, tuition-funded purchasing from local suppliers. Defendants Emmanuel Argiros and Cindy Argiros continued the enterprise's pattern of concealment following FFS's 2014 closure through the below-market transfers of the FFS real

property and the incorporation of Defendant K9-5 Inc. described in the Tolling section supra, transactions that dissipated the enterprise's assets and furthered its concealment from former students, including Plaintiff, with reasonably foreseeable claims arising from the conduct alleged herein. Defendant Eagle Valley Search, Rescue and Recovery Team, Inc., upon information and belief, conducted its search dog operation in common with the enterprise's canine program, the Dog Corps, through their shared principal, Rita Argiros, the enterprise's Executive Program Director, and received the benefit of the children's unpaid labor within that operation and of the labor of the student body, including Plaintiff, that ran the institution housing it. The Highlights Defendants, upon information and belief, maintained through their own longtime employee and author, Cheripko, a continuous relationship with the enterprise, sold their publications into its purported educational program, received the benefit of the children's labor at their Wayne County retreat, and lent the enterprise the legitimacy of an established educational publisher. Defendant Chapel Hill Land Holdings LLC participated in and benefited from the enterprise's concealment by acquiring the FFS real property with notice of the claims against the transferors and, on information and belief, by retaining undisclosed on that property, for approximately a decade, the institutional records that survived the destruction described herein.

84. Defendant Paul Geer participated in the conduct of the enterprise's affairs as a teacher, as the director of its choir, and as the custodian of children on its trips off the campus throughout Plaintiff's enrollment, including the trips to Toronto on which Plaintiff was transported, while the enterprise, with knowledge of his confessed sexual misconduct with students, retained him for the value his choir brought to it, and drew his compensation for years from the enterprise's account at NBT Bank.

**Pattern of Racketeering Activity.**

85. Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), including the following predicate acts committed repeatedly over the course of Plaintiff's enrollment and the enterprise's decades-long operation:

(a) Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343: Defendants used the United States mail and interstate wire communications to transmit fraudulent recruitment and marketing materials and to collect tuition payments, including the tuition and charges paid on Plaintiff's behalf by her parents from Westchester County, New York, in furtherance of the scheme to defraud families regarding the true nature of FFS;

(b) Money Laundering, 18 U.S.C. § 1956: Defendants processed and concealed the fraudulently obtained proceeds of the enterprise through accounts maintained at NBT Bank;

(c) Forced Labor, 18 U.S.C. § 1589: Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Paul Geer obtained Plaintiff's labor and services through physical restraint and the scheme, plan, and pattern intended to cause Plaintiff to believe that failure to perform such labor would result in serious harm to her, including the corner, enforced silence, food restriction, the extension of her confinement, humiliation before her peers, and separation from her family;

(d) Trafficking with Respect to Forced Labor, 18 U.S.C. § 1590: Defendants recruited, transported, including on the trips out of the State and out of the country described herein, harbored, and obtained Plaintiff and other minors across state lines for the labor and services described herein;

(e) Transportation of Minors, 18 U.S.C. § 2423: Defendants transported minors in FFS's custody, including Plaintiff, in interstate and foreign commerce, including to Toronto, Ontario, Canada, to Washington, D.C., to Virginia, and to Pennsylvania, with the intent that they engage in sexual activity for which a person can be charged with a criminal offense, as established as to Defendant Paul Geer by his 2025 federal conviction for transporting FFS students to Maine in 1994 and to Toronto in 2001, during Plaintiff's enrollment, conduct of which the institutional Defendants had knowledge and which they permitted to continue throughout Plaintiff's enrollment; and

(f) Sexual Exploitation of Children, 18 U.S.C. §§ 2251 and 2252: on information and belief, Defendants used minors in FFS's custody, including Plaintiff, in the production of visual depictions of unclothed children in the course of the institution's intake photography practice, using materials that had traveled in interstate commerce, and knowingly retained those depictions.

**Continuity.**

86. The pattern of racketeering activity spanned multiple decades, encompassed numerous victims across the related actions described herein, and employed the same methods consistently over time, satisfying both closed-ended and open-ended continuity requirements.

**Conduct of the Enterprise.**

87. Each Defendant conducted or participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(c).

**Causation and Damages.**

88. Plaintiff was injured in her business and property by reason of Defendants' racketeering activity. Defendants obtained substantial tuition and charges, on information and belief

approximately ninety thousand dollars together with the separately billed course, trip, and incidental charges described herein, paid by Plaintiff's parents for treatment and schooling they never provided; that tuition was a total economic loss, money paid for which nothing was delivered, and no credit earned for the separately billed courses was ever accepted by any college. Defendants further extracted from Plaintiff nearly three years of uncompensated institutional labor, including the daily operation of the institution's breakfast kitchen, whose value they retained. These are concrete financial injuries to Plaintiff's business and property, independent of any psychological injury and directly traceable to Defendants' racketeering. Plaintiff was further injured in her business and property by the impairment of her earning capacity reflected in the loss of nearly three years of education and in the periods of leave she has been compelled to take from her employment, and by the loss in 2018 of her fifty percent ownership interest in a business grossing approximately one million two hundred thousand dollars per year, the closure of the retail business she had founded, and the loss of her home, each a loss of business and property proximately resulting from the conduct alleged herein. Plaintiff is entitled to recover threefold her damages, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

**Statute of Limitations.**

89. All applicable limitations periods are tolled as set forth in the Tolling section supra.

**COUNT II: RICO CONSPIRACY (18 U.S.C. § 1962(d))**

**(Against All Defendants)**

90. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

91. Each Defendant agreed and conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs of the racketeering enterprise

described in Count I through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). Each Defendant knew of the essential nature and scope of the enterprise and its scheme and knowingly agreed to participate in, facilitate, and further it. Under Salinas v. United States, 522 U.S. 52 (1997), a defendant may be liable for RICO conspiracy upon proof that it agreed to the overall objective of the conspiracy, that the enterprise's affairs be conducted through a pattern of racketeering activity, whether or not that defendant agreed to commit, or itself committed, any two or more predicate acts.

92. Each Defendant's agreement is evidenced by its own knowing, sustained participation in the scheme, as alleged in the Enterprise allegations of Count I above and incorporated here: Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros agreed to and did direct and administer the institution's continued unlicensed operation, enrollment, and confinement of children, including Plaintiff, notwithstanding the 1990 cease and desist order, and the forced-labor, isolation, food-deprivation, and sanction practices through which the enterprise's affairs were conducted; Defendants NBT Bank, N.A. and NBT Bancorp Inc. agreed to and did continue, for decades and through 2026, to maintain the enterprise's accounts, to extend and renew secured credit against collateral that was the fruit of the children's forced labor, to hold thereby a financial interest in the operation's continuation and in the continued confinement of the children whose labor secured and repaid that credit, to finance the 2014 disposition of the enterprise's principal asset, and to refrain from filing any Suspicious Activity Report or making any disclosure to a regulator or law enforcement agency, despite escalating notice culminating in the 2024 indictment and 2025 conviction of Paul Geer, an agreement evidenced by the renewal of that credit at each of 2002, 2004, 2006, 2008, 2010, 2011, 2013, 2015, and 2016, and by the lien it chose to hold through December 18, 2021; Defendant Sysco agreed to and did continue its recurring, tuition-funded

supply relationship with the enterprise while its own drivers observed the child labor from which it benefited; Defendant Eagle Valley agreed to and did, through its own founder and president, conduct its canine operation in common with the enterprise and take the benefit of the children's unpaid labor; the Highlights Defendants agreed to and did maintain their relationship with the enterprise through their embedded author while selling their publications into it and taking the benefit of the children's labor at their retreat; Defendant Lackawanna College agreed to and did continue delivering and collecting payment for coursework on the campus through the enterprise's own staff while lending the enterprise the legitimacy of accredited coursework; Defendant NATSAP agreed to and did continue collecting membership dues from the enterprise while lending it the accreditation on which placing families and referring consultants relied; Defendant The Hancock Herald agreed to and did continue publishing content promoting the enterprise's legitimacy while omitting matters of public concern regarding its operation; Defendant Jeffrey Brain agreed to and did continue directing the enterprise's admissions and public relations, including authoring or approving the May 2008 congressional response described herein, while drawing his compensation from the enterprise's proceeds; and Defendants Emmanuel Argiros and Cindy Argiros agreed to and did, following the 2014 closure, direct the disposition of the enterprise's remaining assets through Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc. Whether or not NBT Bank ever filed a Suspicious Activity Report, the result is the same. A report to a federal financial database is not a disclosure to the authorities investigating and prosecuting the conduct at FFS, to this Court, or to the children, and the obstruction alleged here consists of the bank's own conduct toward that enforcement effort: its continued servicing and financing of the enterprise, its refusal to hold, decline, or withdraw, and its

retention and non-production of the only surviving financial record of the enterprise. No filing cured that conduct, and none excuses it.

93. Overt acts committed in furtherance of the conspiracy, within the applicable limitations period, include: the deliberate destruction of student records, abuse complaints, and other institutional documentation by the Argiros family, as confirmed by testimony at Paul Geer's 2025 federal criminal trial; the November 2014 below-market conveyance of the FFS real property by Kasos Co Family LP to Chapel Hill Land Holdings LLC; the June 2016 conveyance of an additional parcel by Defendant Emmanuel Argiros to Chapel Hill Land Holdings LLC; the 2014 incorporation of Defendant K9-5 Inc. immediately upon FFS's closure; Chapel Hill Land Holdings LLC's continued concealment, for approximately a decade following the 2014 closure, of surviving institutional records on the former campus property, until their recovery by federal law enforcement pursuant to a search warrant; and NBT Bank's continued maintenance of, and failure to report or disclose, the enterprise's account relationships following the 2024 indictment and March 3, 2025 conviction of Paul Geer, a course of silence continuing through 2026 and through the filing of this action. Each of these acts was committed within the limitations period and independently satisfies the overt-act requirement of the conspiracy alleged in this Count.

94. Plaintiff was injured in her business and property by reason of the predicate acts of racketeering, and the overt acts, committed in furtherance of the conspiracy alleged in this Count, in the same respects set forth in Count I above, and is entitled to recover threefold the damages she sustained, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c). All applicable limitations periods are tolled as set forth in the Tolling section supra.

**COUNT III: FORCED LABOR, 18 U.S.C. §§ 1589 AND 1595**

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Paul Geer)**

95. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

96. From October 28, 2000 through June 2002, Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Paul Geer, acting through the staff members and senior students described herein, knowingly obtained Plaintiff's labor and services, including her kitchen and breakfast-crew labor, dishwashing, laundry, snow shoveling, inspections, rock sanctions, and the labor performed at the retreat house, by means of force and physical restraint, including her confinement to a campus she could not leave and confinement to a corner; by means of serious harm and threats of serious harm, including the discontinuation of her medication, food restriction, enforced silence, the loss of contact with her parents, and the extension of her confinement and labor as punishment; by means of a scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform such labor, she would suffer serious harm, including sanction, food restriction, isolation, restraint, the withholding of contact with her family, the extension of her confinement, and her interception and return by law enforcement if she fled; and by means of the abuse of the position of legal custody and control Defendants held over Plaintiff, a minor throughout her enrollment. The same Defendants obtained Plaintiff's labor by the same means from August 1999 through October 27, 2000, conduct pleaded herein as part of the single continuing course of forced labor to which she was subjected, as conduct of the continuing venture alleged herein, and as the basis of her claims under Count V.

97. As a direct and proximate result of this forced labor, Plaintiff suffered the injuries described herein and is entitled to recover damages, including punitive damages where applicable, together

with reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1595(a). All applicable limitations periods are tolled as set forth supra.

**COUNT IV: NBT BANK OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT**

**(18 U.S.C. §§ 1591(d) AND 1595)**

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

98. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

99. At all relevant times, NBT Bank maintained accounts for Education Plus Corporation d/b/a Family Foundation School and for the Argiros Defendants individually, through which the financial proceeds of the enterprise were deposited, transferred, and disbursed.

100. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition. That enforcement effort was not confined to the counts ultimately charged against one staff member. The United States publicly solicited information from former FFS students concerning abuse at the institution, executed a search warrant on the former campus and recovered institutional records there, and tried and convicted an FFS staff member for transporting FFS students in interstate and foreign commerce for sexual activity; the conduct under investigation encompassed the sexual exploitation of the children in FFS's custody, and the obstruction of that effort is the obstruction of the enforcement of 18 U.S.C. § 1591. NBT Bank obstructed, attempted to obstruct, and interfered with that enforcement by maintaining the FFS account relationship and continuing to process the enterprise's financial transactions without filing a Suspicious Activity Report and without terminating that relationship, notwithstanding constructive notice from the public record beginning no later than the 1990 cease and desist order, the secured-lender knowledge arising from the blanket security interests described

herein, including the December 2, 2002 filing made six months after Plaintiff's departure, against collateral her labor had built, the knowledge of its Hancock branch manager, Dawn Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, and the underwriting, collateral inspection, and financial review that its March 24, 2010 loan against the campus required, or, if the bank skipped that underwriting, its deliberate avoidance of the knowledge it would have supplied, official notice upon the December 29, 2010 joint findings of four New York State agencies that former students' accounts of abusive practices at the institution over the preceding decade were credible, findings issued in the same year as the bank's March 24, 2010 loan against the campus, escalated notice upon the enterprise's 2014 closure amid publicized abuse allegations, and actual notice upon the 2024 federal indictment of Paul Geer for federal sex offenses committed against FFS students, notice renewed and confirmed upon his conviction on March 3, 2025 after a public two-week trial. Whether or not NBT Bank ever filed a Suspicious Activity Report, the result is the same. A report to a federal financial database is not a disclosure to the authorities investigating and prosecuting the conduct at FFS, to this Court, or to the children, and the obstruction alleged here consists of the bank's own conduct toward that enforcement effort: its continued servicing and financing of the enterprise, its refusal to hold, decline, or withdraw, and its retention and non-production of the only surviving financial record of the enterprise. No filing cured that conduct, and none excuses it. The bank's obligation to report suspicious activity is independent of, and does not await, any request from law enforcement, and arose anew at each stage. At each stage, NBT Bank's obligations of customer due diligence and suspicious-activity reporting required inquiry; at each stage, the bank chose the continued receipt of fees, interest, and deposits over compliance. On information and belief, the bank's own payroll ledger for the

enterprise records every paycheck issued to Paul Geer through 2014, the entire period during which FFS retained him after learning of his confessed sexual misconduct with students; after his indictment and conviction publicly established what those payments had bought, the bank did not review, freeze, report, or otherwise act upon the accounts through which he had been paid or the accounts of the principals who had kept him. On information and belief, the bank also took no step, after the indictment or the conviction, to freeze or review the accounts of Chapel Hill Land Holdings LLC, whose purchase of the campus it had financed and on whose property the enterprise's surviving records had been concealed until recovered by federal search warrant, and did not call, terminate, or withdraw the credit it had extended against that property.

101. The obstruction is a continuing violation: following both Geer's indictment and his conviction, no report has been made, no disclosure has issued, and no corrective action has been taken, through 2025 and into 2026 and through the filing of this action, and each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period. On information and belief, throughout that period the bank has continued to hold the accounts of, and to carry the credit it extended in 2015 to, Chapel Hill Land Holdings LLC, the entity whose acquisition of the campus it financed and on whose property the enterprise's records lay concealed, and has neither frozen those accounts nor withdrawn that credit.

102. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: NBT Bank's conduct sustained the concealment that delayed Plaintiff's discovery and assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had, injury accruing after Plaintiff's enrollment and continuing through the filing of this action. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory

damages, punitive damages, attorneys' fees, and costs against NBT Bank, N.A. and NBT Bancorp Inc., jointly and severally. All applicable limitations periods are tolled as set forth supra.

**COUNT V: NY SOC. SERV. LAW § 483-bb (CHILD VICTIMS OF LABOR TRAFFICKING)**

**(Against All Defendants)**

103. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

104. N.Y. Social Services Law § 483-bb(c) provides a civil cause of action to an individual who is a victim of conduct prohibited by N.Y. Penal Law §§ 135.35 (labor trafficking) and 135.37 (aggravated labor trafficking), and permits recovery not only against the perpetrator of such conduct but also against whoever knowingly advances or profits from, or should have known she or she was advancing or profiting from, an act in violation of those provisions.

105. While a minor in Defendants' custody, Plaintiff was the victim of labor trafficking: she was recruited through the referral network described herein, delivered to and harbored at FFS on the misrepresentations described herein, and she was compelled to provide labor and services, including the kitchen, breakfast-crew, dishwashing, laundry, snow-shoveling, inspection, rock-carrying, and retreat-house labor described herein, by means of physical restraint, confinement, the discontinuation of her medication, food restriction, enforced silence, the monitoring and censorship of her family contact, and the institutional sanction regime described herein, from August 1999 through June 2002.

106. Each Defendant engaged in, advanced, or profited from, or should have known it was advancing or profiting from, that labor trafficking, in the same respects and for the same reasons set forth as to each Defendant in the Enterprise allegations of Count I. NBT Bank, N.A. and NBT Bancorp Inc. profited from the account relationships through which the proceeds of the operation,

including tuition paid on Plaintiff's behalf, were deposited, processed, and disbursed, and from the secured credit whose collateral was, in substantial part, the product of the children's labor, including the kitchen Plaintiff ran, the dishes she washed, the laundry she did, the walkways she cleared, the buildings and grounds she cleaned and inspected, and the food inventory she handled and prepared; Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc. held, received, and continue to hold and benefit from property and assets of the operation, including property improved and maintained by student labor and, as to Chapel Hill Land Holdings LLC, the continuing commercial use, season after season through the present, of the campus buildings and grounds the children built and maintained; Eagle Valley Search, Rescue and Recovery Team, Inc., upon information and belief, profited from the unpaid labor of the enterprise's children in the canine operation conducted in common with it by its own founder and president, and from the labor of the student body, including Plaintiff, that ran the institution housing that operation; the Highlights Defendants, upon information and belief, advanced the trafficking through their continuous relationship with the enterprise's embedded staff and profited from the enterprise's purchases of their publications and from the labor of its children at their retreat; Lackawanna College profited from, and should have known it was profiting from, that labor trafficking, receiving payment from Plaintiff's parents for coursework delivered on the campus by the enterprise's staff and lending the operation the legitimacy on which its continued enrollment of children depended; NATSAP received membership dues from FFS while lending it the institutional legitimacy on which enrolling families and referring consultants relied; Sysco profited from, and should have known it was profiting from, that labor trafficking, its own personnel having observed the children of the institution, including, on information and belief, Plaintiff, unloading its trucks and handling the food it supplied; Jeffrey Brain profited from and

advanced that labor trafficking, drawing his compensation from an operation whose revenues, facilities, and going-concern value were the product of the labor of its students, including Plaintiff, and advancing, through the public concealment described herein, the operation's continuation; and the Village of Hancock, the Town of Hancock, the County of Delaware, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors advanced that trafficking by permitting the institution's continued, unlicensed operation within their jurisdictions notwithstanding the official notice described herein and by locating and returning to the institution students who fled it, and, pleaded in the alternative, profited from that continued operation as alleged in Count I.

107. Social Services Law § 483-bb(c)(ii) provides that an action under that subdivision shall be commenced within fifteen years of the date on which the trafficking victim was freed from the trafficking situation or, if the victim was a minor when the act of human trafficking occurred, within fifteen years after the date the victim attains the age of majority, and CPLR 212(e) provides that the period does not begin to run, and is tolled, during any period in which the victim is or remains subject to such conduct, as Plaintiff remained through June 2002. The running of that period is further tolled and suspended under § 483-bb(c)(iii) and (iii)(A) by Plaintiff's minority until September 21, 2002 and by the incapacity described herein; under § 483-bb(c)(iv) by her inability, due to circumstances resulting from the trafficking situation and the concealment described herein, reasonably to discover her cause of action; and under § 483-bb(c)(iii)(C) by Defendants' conduct inducing delay in the filing of this action and causing duress upon her, as described herein, which estops them from asserting the limitations defense; and under § 483-bb(c)(iii)(D) each such suspension applies to all other related claims arising out of the trafficking

situation alleged herein. Plaintiff is entitled to compensatory and punitive damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally.

## COUNT VI: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT BY DESTRUCTION AND CONCEALMENT OF RECORDS (18 U.S.C. §§ 1591(d) AND 1595)

**(Against Education Plus Corporation and Emmanuel Argiros)**

108. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

109. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

110. As confirmed by testimony at Paul Geer's 2025 federal criminal trial, including the trial testimony of Defendant Emmanuel Argiros himself, the Argiros family deliberately destroyed student records, abuse complaints, and other institutional documentation of FFS, in and around the school's 2014 closure, including, on information and belief, records concerning Plaintiff's own enrollment, her intake and the intake photograph, the discontinuation of her prescribed medication and the absence of any physician's authorization for it, the trips on which she was taken to Toronto in Geer's custody and the rosters of the children transported on them, and the complaints and reports of students concerning the sexual conduct of staff. That destruction was carried out by and at the direction of Defendant Emmanuel Argiros and members of the Argiros family acting for Education Plus Corporation, after FFS had been sued civilly and while Defendant Argiros was concerned about his own civil exposure, and it obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591 by destroying the evidentiary record of the sex trafficking of FFS students for which Paul Geer was later prosecuted.

111. The obstruction is a continuing violation: the destroyed records have never been restored, reconstructed, or disclosed; no disclosure of the destruction or of the contents of the destroyed files has been made to any regulator, investigator, or law enforcement agency; and the concealment the destruction achieved has been maintained through Geer's 2024 indictment, his conviction on March 3, 2025, and the filing of this action, each month of that continued concealment constituting a fresh act of obstruction within the limitations period.

112. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the destruction of the institution's records deprived Plaintiff of the evidentiary record to which she was entitled, prolonged the concealment that delayed her discovery of her claims until 2025, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT VII: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT BY DESTRUCTION AND CONCEALMENT OF RECORDS (18 U.S.C. §§ 1590(b) AND 1595)

**(Against Education Plus Corporation and Emmanuel Argiros)**

113. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

114. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

115. As confirmed by testimony at Paul Geer's 2025 federal criminal trial, including the trial testimony of Defendant Emmanuel Argiros himself, the Argiros family deliberately destroyed

student records, abuse complaints, and other institutional documentation of FFS, in and around the school's 2014 closure, including, on information and belief, records concerning Plaintiff's own enrollment, her sanctions and labor assignments, her assignment as head of the breakfast crew, her food restrictions, the institution's billing of families for the overnight isolation of their children, and the payments made on her behalf by her parents, including the separately billed course charges. That destruction was carried out by and at the direction of Defendant Emmanuel Argiros and members of the Argiros family acting for Education Plus Corporation, and it obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by destroying the evidentiary record of the operation's forced-labor practices, and no enforcement action under 18 U.S.C. § 1590 has ever been brought against the operation or its principals.

116. The obstruction is a continuing violation: the destroyed records have never been restored, reconstructed, or disclosed; no disclosure of the destruction or of the contents of the destroyed files has been made to any regulator, investigator, or law enforcement agency; and the concealment the destruction achieved has been maintained through Geer's 2024 indictment, his conviction on March 3, 2025, and the filing of this action, each month of that continued concealment constituting a fresh act of obstruction within the limitations period.

117. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the destruction of the institution's records deprived Plaintiff of the evidentiary record to which she was entitled, prolonged the concealment that delayed her discovery of her claims until 2025, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against the Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT VIII: OBSTRUCTION OF LABOR TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1590(b) AND 1595)

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

118. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

119. 18 U.S.C. § 1590(a) prohibits knowingly recruiting, harboring, transporting, providing, or obtaining any person for labor or services in violation of chapter 77 of Title 18, and 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of that section. 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

120. As alleged herein, the operation of FFS recruited, transported, harbored, and obtained minor children, including Plaintiff, for labor and services, and NBT Bank maintained the accounts through which the financial proceeds of that operation were deposited, transferred, and disbursed. That enforcement effort was not confined to the counts ultimately charged against one staff member. The United States publicly solicited information from former FFS students concerning abuse at the institution, executed a search warrant on the former campus and recovered institutional records there, and tried and convicted an FFS staff member for transporting FFS students in interstate and foreign commerce for sexual activity; the conduct under investigation encompassed the forced labor of the children in FFS's custody, which the government itself described in charging that staff member, and the obstruction of that effort is the obstruction of the enforcement of 18 U.S.C. §§ 1589 and 1590. NBT Bank obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by maintaining that account relationship and continuing to process the operation's financial transactions without filing a Suspicious Activity Report and without terminating that relationship, notwithstanding constructive notice from the public record

beginning no later than the 1990 cease and desist order, the secured-lender knowledge arising from the blanket security interests described herein, including the December 2, 2002 filing made six months after Plaintiff's departure, against collateral her labor had built, whose collateral was the operation's inventory, accounts, and enrollment contracts, the knowledge of its Hancock branch manager, Dawn Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, and the March 24, 2010 loan against the campus that the children's labor had improved and maintained, together with the underwriting, collateral inspection, and financial review that credit required, or, if the bank skipped that underwriting, its deliberate avoidance of the knowledge it would have supplied, official notice upon the December 29, 2010 joint findings of four New York State agencies that former students' accounts of abusive practices at the institution over the preceding decade were credible, findings issued in the same year as the bank's March 24, 2010 loan against the campus, escalated notice upon the enterprise's 2014 closure amid publicized abuse allegations, and actual notice upon the 2024 federal indictment of Paul Geer, notice renewed and confirmed upon his conviction on March 3, 2025. Whether or not NBT Bank ever filed a Suspicious Activity Report, the result is the same. A report to a federal financial database is not a disclosure to the authorities investigating and prosecuting the conduct at FFS, to this Court, or to the children, and the obstruction alleged here consists of the bank's own conduct toward that enforcement effort: its continued servicing and financing of the enterprise, its refusal to hold, decline, or withdraw, and its retention and non-production of the only surviving financial record of the enterprise. No filing cured that conduct, and none excuses it. The bank's obligation to report suspicious activity is independent of, and does not await, any request from law enforcement, and arose anew at each stage. No enforcement action under 18 U.S.C. § 1590 has ever been brought

against the operation or its principals; the concealment the bank's conduct sustained prevented that enforcement.

121. The obstruction is a continuing violation: following both Geer's indictment and his conviction, no report has been made, no disclosure has issued, and no corrective action has been taken, through 2025 and into 2026 and through the filing of this action, and each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period. On information and belief, throughout that period the bank has continued to hold the accounts of, and to carry the credit it extended in 2015 to, Chapel Hill Land Holdings LLC, the entity whose acquisition of the campus it financed and on whose property the enterprise's records lay concealed, and has neither frozen those accounts nor withdrawn that credit.

122. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: NBT Bank's conduct sustained the concealment that delayed Plaintiff's discovery and assertion of her claims arising from the forced-labor operation described herein and facilitated the dissipation of the assets against which her recovery must be had, injury accruing after Plaintiff's enrollment and continuing through the filing of this action. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against NBT Bank, N.A. and NBT Bancorp Inc., jointly and severally. All applicable limitations periods are tolled as set forth supra.

**COUNT IX: NEGLIGENT FAILURE TO PROVIDE PROMISED THERAPEUTIC SERVICES, FRAUDULENT AND NEGLIGENT MISREPRESENTATION, N.Y. GEN. BUS. LAW § 349**

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Jeffrey Brain)**

123. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein. These claims are pleaded simultaneously with, and without prejudice to, all other theories of liability set forth in this Complaint pursuant to Federal Rule of Civil Procedure 8(d).

124. Defendants owed Plaintiff a distinct duty of reasonable care arising from their express representations, made to Plaintiff's parents and to the consultant who referred her, that FFS would provide qualified therapeutic treatment and an education to Plaintiff, a fourteen-year-old girl with a diagnosed attention disorder who was on prescribed medication and under the care of a therapist and a psychiatrist. That duty was breached by Defendants' total failure to employ qualified professionals or deliver any of the promised services, by the discontinuation of her medication without any physician's involvement, and by FFS's substitution of forced labor, the corner, enforced silence, food restriction, and sexualized humiliation for any genuine treatment or education of Plaintiff, and by its presentation of the compliance that fear produced as therapeutic progress, so that the condition for which Plaintiff was enrolled was masked rather than treated during the years in which it could have been treated.

125. Defendants breached their duty of reasonable care by: (a) failing to employ any qualified psychiatric, psychological, medical, or licensed therapeutic professionals, notwithstanding the representation to Plaintiff's parents that FFS provided treatment; (b) discontinuing the medication a physician had prescribed for Plaintiff without any psychiatrist or physician seeing her or

authorizing the discontinuation, and substituting nothing for it; (c) failing to conduct any meaningful evaluation, diagnosis, or treatment planning for Plaintiff, who never received treatment from a qualified professional during her enrollment; (d) substituting forced labor, the corner, enforced silence, and food restriction for genuine treatment; (e) subjecting Plaintiff to an intake strip search and, on information and belief, photographing her, without medical screening, parental consent, or lawful authority; (f) exposing Plaintiff, a minor, to sexual material at the table; (g) transporting Plaintiff, a minor, across state and international lines in the custody of a staff member who had confessed sexual misconduct with students and whose trips were, as later established, the occasion of criminal sexual activity against FFS students; (h) removing Plaintiff from instruction for sanctions and labor and then running her through doubled college-credit courses, billed to her parents, that no college accepted; (i) billing families for the overnight isolation of their children under a description that concealed what the charge was for; and (j) continuing to enroll and confine students, including Plaintiff, notwithstanding the 1990 cease and desist order. Defendants' representations that FFS was a qualified therapeutic institution and a school constitute deceptive acts and practices within the meaning of N.Y. General Business Law § 349, directed at consumers generally through FFS's marketing materials and causing Plaintiff's family the actual injury of tuition and charges paid for services never rendered.

126. As a direct and proximate result of Defendants' negligent, fraudulent, and deceptive conduct, independently of any other theory of liability in this Complaint, Plaintiff suffered the injuries described herein and is entitled to compensatory damages and punitive damages. This claim is timely pursuant to CPLR 213(8) and N.Y. General Business Law § 349(c), as set forth in the Tolling section supra.

## COUNT X: NEGLIGENCE AND NEGLIGENT SUPERVISION, HIRING, AND RETENTION

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros)**

127. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein. Pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d), and without prejudice to the intentional conduct theories set forth in the preceding and following counts, Defendants owed Plaintiff and other enrolled minor students a non-delegable duty of reasonable care, including a duty to protect students from foreseeable harm caused by FFS staff and by the institution's own custodial and disciplinary practices.

128. Defendants breached that duty by, among other things: continuing to operate and enroll students, including Plaintiff, notwithstanding the 1990 cease and desist order; accepting into their custody a fourteen-year-old with a diagnosed attention disorder without any qualified clinical staff to treat her, and discontinuing her medication without any physician's involvement and with no treatment in its place; directing, permitting, and conducting an intake strip search and, on information and belief, photographing of Plaintiff, without medical screening, parental consent, or lawful authority; imposing sustained forced labor on Plaintiff, including the running of the institution's breakfast kitchen without adult supervision and the kitchen, dish, laundry, snow-shoveling, inspection, and rock-carrying labor described herein; withholding food from her as punishment and confining her to a corner in enforced silence; exposing a minor girl to sexual material at the table; transporting a minor out of the country to Toronto in the custody of a staff member who had confessed to sexual misconduct with students; providing no psychological, psychiatric, or medical treatment of any kind to a child enrolled for treatment; and retaining on

staff, throughout Plaintiff's enrollment, a staff member, Defendant Geer, whom the administration knew, from his own confession to its staff and, on information and belief, from a student's report to Emmanuel Argiros in or about 2001 of a sexual assault on a chorus trip to Toronto, had engaged in sexual misconduct with students, and who has since been convicted of transporting FFS students for the purpose of sexual activity, after refusing a staff member's demand that he be fired. This conduct created an unreasonable and foreseeable risk of harm directly and proximately causing the injuries Plaintiff sustained.

129. As a direct and proximate result of Defendants' negligence, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages. All applicable statutes of limitations are tolled as set forth supra, including pursuant to CPLR 208(b).

## COUNT XI: ASSAULT, BATTERY, FALSE IMPRISONMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Paul Geer)**

130. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

131. The intake strip search to which Plaintiff was subjected, including the observation of her unclothed body while she was made to remove and display her tongue ring, and, on information and belief, the photographing of her before she had been permitted to dress, constituted a battery upon her, then a fourteen-year-old minor, without consent or lawful justification. The search was conducted pursuant to the uniform intake policy adopted, directed, and enforced by Defendants Education Plus Corporation and Betty Argiros, and these Defendants are directly liable, together with the staff who carried it out, for the battery committed in execution of that policy. The staff who confined Plaintiff to a corner in enforced silence, the staff who controlled her food, and the staff

who confined her to the campus and to the institution's custody against her will throughout her enrollment, from the day she was delivered there by the institution's escorts, committed false imprisonment upon Plaintiff. Each such act was performed in execution of the intake, sanction, confinement, and food policies adopted, directed, and enforced by the Defendants named in this Count and within the scope of the duties they assigned, and these Defendants are directly and vicariously liable for them.

132. Independently, the course of conduct described herein, including the intake strip search of a fourteen-year-old girl and, on information and belief, the photographing of her, her seizure from her home and delivery to the institution by escorts, the discontinuation of her medication, the corner and enforced silence in her second week, the tuna and Maypo, the withheld cake, the rock sanctions in February, the sustained forced labor, the exposure of a minor girl to sexual material at the table, the transport of a minor across state and international lines in the custody of a staff member who had confessed sexual misconduct with students, and the censorship of her family contact, was extreme and outrageous, was undertaken intentionally or with reckless disregard of the substantial certainty that it would cause severe emotional distress, and did cause Plaintiff severe and ongoing emotional distress.

133. As a direct and proximate result, Plaintiff suffered the injuries described herein and is entitled to compensatory and punitive damages from the Defendants named in this Count jointly and severally. All applicable statutes of limitations are tolled as set forth supra, including pursuant to CPLR 208(b).

## COUNT XII: COMMON-LAW FRAUD AND FRAUDULENT CONCEALMENT (CPLR 213(8))

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Jeffrey Brain)**

134. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

135. Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Jeffrey Brain, directly and through FFS staff, knowingly made material misrepresentations of fact to Plaintiff's parents and to the educational consultant who referred her, including that FFS was a qualified therapeutic boarding school staffed to provide treatment, psychological and psychiatric services, a high school education, and a supervised residential environment, that Plaintiff would receive qualified treatment, that Plaintiff was attending school and making therapeutic progress, that the college-credit courses for which they were separately billed would earn her transferable credit, and, to Plaintiff herself, that she was the one in the wrong. Each of these representations was false when made, was known by these Defendants to be false, and was made with the intent that Plaintiff's parents rely upon it. These Defendants also concealed from Plaintiff's parents, while holding their daughter in its custody, that the institution operated under a public cease and desist order, that it employed no qualified treatment professionals, that it had discontinued the medication her physician had prescribed without any physician's involvement, that it was confining her to a corner in enforced silence and restricting her food, that it billed families for the overnight isolation of their children under a description that concealed what the charge was for, that its practices were later the subject of congressional oversight hearings whose findings it publicly minimized, and that it retained on staff, in charge of the trips on which it

transported their daughter out of the country, a man who had confessed to sexual misconduct with students.

136. Plaintiff's parents reasonably relied on those misrepresentations, procuring and paying for Plaintiff's placement and the separately billed courses, surrendering Plaintiff to Defendants' custody, and continuing to do so for nearly three years. Defendants reinforced and concealed the fraud through the devices described herein, including the monitoring and censorship of Plaintiff's family contact, the instillation in Plaintiff of the belief that she was the one in the wrong, the presentation of fear-induced compliance as therapeutic progress, the May 2008 public minimization of the institution's practices, made after Plaintiff had left its custody, which kept her family deceived, and the destruction of institutional records, so that the true conditions of her confinement could not be discovered.

137. Defendants Emmanuel Argiros and Cindy Argiros separately and independently perpetuated that concealment following FFS's 2014 closure. Through the transfers described in the Tolling section supra, and through their purposeful silence following the 2025 public disclosure of the enterprise's conduct at Geer's federal criminal trial, Defendants Emmanuel Argiros and Cindy Argiros took no step to disclose, correct, or come forward with the truth concerning the conduct to which Plaintiff and other FFS students had been subjected, notwithstanding their knowledge of it, and instead moved the enterprise's remaining assets beyond the reach of the students, including Plaintiff, who had been defrauded and injured. Defendant Jeffrey Brain furthered that concealment through the May 2008 congressional response described herein.

138. As a direct and proximate result, Plaintiff suffered the pecuniary and personal injuries described herein. This claim is timely pursuant to CPLR 213(8) and the Tolling allegations set forth

supra. Plaintiff is entitled to compensatory and punitive damages from the Defendants named in this Count jointly and severally.

**COUNT XIII: COMMON-LAW AIDING AND ABETTING FRAUD**

**(Against Jeffrey Brain)**

139. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

140. As set forth in Count XII, Education Plus Corporation and the Argiros Defendants perpetrated a fraud upon Plaintiff and her parents through material misrepresentations concerning the nature of FFS and the services for which they charged, upon which Plaintiff's parents relied to their detriment.

141. Defendant Jeffrey Brain had actual knowledge of that fraud. As Director of Admissions and Vice President for External Relations from approximately 2005 through the institution's 2014 closure, he directed the admissions and external relations apparatus through which the same representations that had been made to Plaintiff's family and the consultant who referred her were made to the families who followed; he knew that the institution employed no licensed psychiatrist, psychologist, or clinician; he knew the sanction, labor, and confinement practices in use on the campus, because in May 2008 he was the named contact for and, on information and belief, an author or approving officer of the institution's public response minimizing those practices to a congressional committee; and, on information and belief, he knew that the institution operated under the public cease and desist order described herein.

142. Defendant Brain substantially assisted the fraud in its concealment phase: by publicly minimizing the institution's practices in May 2008, a public statement that kept the families of former students, including Plaintiff's, deceived as to what had been done to their children and delayed Plaintiff's discovery of her claims; by directing the recruiting and marketing through

which families were induced to enroll and to keep paying on the same representations that had been made to Plaintiff's family; and by continuing that recruitment and concealment through the institution's 2014 closure, perpetuating the fraud practiced on Plaintiff's family and the concealment of it.

143. As a direct and proximate result, Plaintiff suffered the pecuniary and personal injuries described herein. This claim is timely pursuant to CPLR 213(8), measured from Plaintiff's discovery as alleged supra, and all applicable statutes of limitations are otherwise tolled as set forth supra. Plaintiff is entitled to compensatory and punitive damages from Defendant Brain.

## COUNT XIV: TRAFFICKING WITH RESPECT TO FORCED LABOR (18 U.S.C. §§ 1590 AND 1595)

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Paul Geer)**

144. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

145. Throughout Plaintiff's enrollment, from August 1999 through June 2002, and in violation of 18 U.S.C. § 1590 from October 28, 2000 forward, Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Paul Geer knowingly recruited Plaintiff through the referral pipeline described herein, received Plaintiff into their custody at the FFS campus upon her delivery there by the escorts the institution recommended and arranged, harbored, maintained, and obtained Plaintiff, a minor in their custody, for labor and services in violation of 18 U.S.C. § 1589, including the kitchen, breakfast-crew, dishwashing, laundry, snow-shoveling, inspection, rock-carrying, and retreat-house labor described herein, transported her out of and back into the State of New York and the United States on the trips to Toronto, Washington, D.C., Virginia, and Pennsylvania described herein, and held her at the FFS campus under the regime of confinement,

food restriction, enforced silence, the discontinuation of her medication, monitored and censored family contact, and institutional sanction alleged herein. The same conduct from August 1999 through October 27, 2000 is pleaded as part of the single continuing course of conduct and continuing venture alleged herein.

146. As a direct and proximate result, Plaintiff suffered the injuries described herein and is entitled to recover damages, including punitive damages where applicable, together with reasonable attorneys' fees and costs, pursuant to 18 U.S.C. § 1595(a). All applicable limitations periods are tolled as set forth supra.

**COUNT XV: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT BY CONCEALMENT OF RECORDS (18 U.S.C. §§ 1591(d) AND 1595)**

**(Against Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc.)**

147. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

148. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

149. Chapel Hill Land Holdings LLC obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591 by harboring and concealing the surviving records of the enterprise. Upon acquiring the FFS campus in November 2014, Chapel Hill Land Holdings LLC held on that property, in an outbuilding, institutional records of FFS that had survived the destruction described herein, and those records remained concealed there, within its possession and control as the property's owner, for approximately a decade, never voluntarily disclosed or produced to law enforcement, and were recovered only upon the execution of a federal search

warrant, as confirmed by law enforcement testimony at Paul Geer's 2025 federal criminal trial, the prosecution of federal sex offenses committed against FFS students.

150. At no time before that recovery did Chapel Hill Land Holdings LLC disclose the existence of those records to any authority, and at no time before or since, including after the 2024 federal indictment of Paul Geer and after his conviction on March 3, 2025, has it made any report or any voluntary disclosure concerning the enterprise whose principal asset it received. Each month of that continued concealment and silence constitutes a fresh act of obstruction within the limitations period. French Woods Performing Arts Inc., as operator of the campus and, on information and belief, co-possessor of the outbuilding, harbored and concealed the same records and made the same non-disclosure. On October 2, 2026, after written notice to preserve the outbuilding and its contents and a request to inspect them, Chapel Hill Land Holdings LLC through its attorneys denied awareness of any such structure and refused inspection, as alleged in paragraph 25; that denial, made after notice and after the federal agent's sworn testimony that the records had been recovered from that structure, is a further and continuing act of obstruction by both Defendants named in this Count.

151. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the concealment of the documentary record of the enterprise, including, upon information and belief, records concerning Plaintiff's own enrollment, prolonged the concealment that delayed her discovery and assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

**COUNT XVI: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT BY CONCEALMENT OF RECORDS (18 U.S.C. §§ 1590(b) AND 1595)**

**(Against Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc.)**

152. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

153. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

154. Chapel Hill Land Holdings LLC obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by harboring on its property, in an outbuilding, the surviving institutional records of the enterprise, including, upon information and belief, records of the operation's labor practices, sanctions, finances, and the enrollment of the children whose labor ran it, until their recovery by federal law enforcement pursuant to a search warrant, and by making no voluntary disclosure at any time. Its concealment withheld from enforcement the documentary record of the forced-labor operation alleged herein, and no enforcement action under 18 U.S.C. § 1590 has ever been brought against the operation or its principals. French Woods Performing Arts Inc., as operator of the campus and, on information and belief, co-possessor of the outbuilding, harbored and concealed the same records, and the October 2, 2026 denial and refusal of inspection alleged in paragraph 25, made after written notice to preserve, is a further and continuing act of obstruction by both Defendants named in this Count.

155. Each month of that continued concealment and silence, including following the 2024 federal indictment of Paul Geer and his conviction on March 3, 2025, constitutes a fresh act of obstruction within the limitations period. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: the concealment of the documentary record of the

enterprise, including, upon information and belief, records concerning Plaintiff's own enrollment, prolonged the concealment that delayed her discovery and assertion of her claims and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

**COUNT XVII: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1590(b) AND 1595)**

**(Against Sysco Corporation and Sysco Syracuse, LLC)**

156. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

157. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

158. Throughout the relevant period, including throughout Plaintiff's 1999-2002 enrollment, Sysco supplied the operation's kitchen on a recurring, scheduled basis, its trucks delivering food and institutional supplies directly to the FFS campus, and it was paid for those goods and deliveries from the tuition-funded accounts described herein. At those recurring deliveries Sysco's own drivers observed, and received the benefit of, the labor of the children of the institution, who unloaded Sysco's trucks as part of the uncompensated labor regime alleged herein, delivery after delivery, year after year, without any adult labor crew in their place. Plaintiff was among those children: as the head of the institution's breakfast crew she drew the food Sysco delivered from the institution's coolers and prepared and served it for the entire school each morning, she washed the institution's dishes on its evening crew, and, on information and belief, she was among the students who received and unloaded Sysco's deliveries in the presence of its delivery personnel.

159. Sysco's notice was accordingly of a different character from that of any other Defendant: not financial inference but direct physical observation, its own employees on the campus taking the work of children's hands off its own trucks. Its benefit was likewise direct and twofold: years of recurring institutional sales revenue paid from the operation's tuition-funded accounts, and the children's unloading labor itself, received without cost at each delivery.

160. Sysco obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590 by continuing to supply and service the operation, and to accept payment and the children's labor from it, while making no report and no disclosure to any authority at any time, including after the 2024 federal indictment of Paul Geer and after his conviction on March 3, 2025. Its silence protected a revenue stream its own personnel could observe was serviced by children, and each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

161. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: Sysco's silence prolonged the concealment of the operation's forced labor economy, in which its own supply relationship was embedded, and thereby delayed Plaintiff's discovery and assertion of her claims. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs against Sysco Corporation and Sysco Syracuse, LLC, jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT XVIII: OBSTRUCTION OF SEX TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1591(d) AND 1595)

**(Against Jeffrey Brain)**

162. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

163. 18 U.S.C. § 1591(d) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1591, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

164. Defendant Jeffrey Brain obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1591. In May 2008, in response to sworn testimony presented in connection with oversight hearings of the United States House of Representatives Committee on Education and Labor describing abuse in residential programs including FFS, the institution issued a public response, of which Defendant Brain was the named contact and, on information and belief, an author or approving officer, that publicly minimized and mischaracterized the institutional practices alleged in this Complaint. With that knowledge, Brain thereafter continued to direct the school's external relations, admissions, and public marketing, presenting the institution to placing families as a legitimate therapeutic institution and deflecting and burying the publicly aired allegations rather than reporting them, through the school's final years of operation and its 2014 closure.

165. At no time, then or since, including after the 2024 federal indictment of Paul Geer for federal sex offenses committed against FFS students and after his conviction on March 3, 2025, has Brain made any report or disclosure to any authority. Each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

166. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: Brain's conduct preserved the public legitimacy on which the enterprise's concealment depended, prolonged the concealment that delayed Plaintiff's discovery and assertion of her claims, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages,

punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

**COUNT XIX: OBSTRUCTION OF FORCED LABOR AND LABOR TRAFFICKING ENFORCEMENT (18 U.S.C. §§ 1590(b) AND 1595)**

**(Against Jeffrey Brain)**

167. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

168. 18 U.S.C. § 1590(b) prohibits obstructing, attempting to obstruct, or in any way interfering with or preventing the enforcement of 18 U.S.C. § 1590, and 18 U.S.C. § 1595 provides a civil cause of action for violations of that prohibition.

169. Defendant Jeffrey Brain obstructed, attempted to obstruct, and interfered with the enforcement of 18 U.S.C. § 1590. In May 2008, in response to sworn testimony presented in connection with oversight hearings of the United States House of Representatives Committee on Education and Labor describing abuse and forced labor in residential programs including FFS, the institution issued a public response, of which Defendant Brain was the named contact and, on information and belief, an author or approving officer, that publicly minimized and mischaracterized the institutional labor practices alleged in this Complaint. With that knowledge, Brain thereafter continued to direct the school's external relations, admissions, and public marketing, presenting the institution to placing families as a legitimate therapeutic institution and deflecting and burying the publicly aired allegations rather than reporting them, through the school's final years of operation and its 2014 closure.

170. At no time, then or since, including after the 2024 federal indictment of Paul Geer and after his conviction on March 3, 2025, has Brain made any report or disclosure to any authority. Each month of that post-indictment silence constitutes a fresh act of obstruction within the limitations period.

171. Plaintiff was injured by the obstruction itself, separately and distinctly from the underlying violations: Brain's conduct preserved the public legitimacy on which the enterprise's concealment depended, prolonged the concealment that delayed Plaintiff's discovery and assertion of her claims, and facilitated the dissipation of the assets against which her recovery must be had. Plaintiff is entitled to civil recovery pursuant to 18 U.S.C. § 1595, including compensatory damages, punitive damages, attorneys' fees, and costs. All applicable limitations periods are tolled as set forth supra.

**COUNT XX: KNOWING BENEFICIARIES OF FORCED LABOR AND LABOR TRAFFICKING (18 U.S.C. §§ 1589(b), 1590, AND 1595)**

**(Against All Defendants Other Than NBT Bank, N.A., NBT Bancorp Inc., Sysco Corporation, Sysco Syracuse, LLC, Chapel Hill Land Holdings LLC, and French Woods Performing Arts Inc.)**

172. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

173. The operation of FFS was a venture engaged in violations of 18 U.S.C. §§ 1589 and 1590, as alleged herein: it obtained the labor and services of the children in its custody, including Plaintiff, by force, physical restraint, serious harm, and the abuse of its custodial position, and it recruited, transported, harbored, and obtained those children for that labor. Each Defendant named in this Count knowingly benefited, financially or by receiving anything of value, from participation in that venture, knowing or in reckless disregard of the fact, or in circumstances in which it should have known, that the venture obtained the labor and services of the children in its custody, including Plaintiff, by the unlawful means alleged herein.

174. The benefits received include: as to Education Plus Corporation, Betty Argiros, Emmanuel Argiros, and Cindy Argiros, the children's labor itself, which ran the institution and displaced the

wages a lawful residential school must pay, together with the tuition margins undiminished by labor costs; as to Jeffrey Brain, compensation for his role in the operation; as to Kasos Co Family LP, Kasos Enterprises LLC, Chapel Hill Land Holdings LLC, and K9-5 Inc., real property and successor assets improved, maintained, and built with the unpaid labor of the children, and, as to Eagle Valley, upon information and belief, the care, maintenance, and training of dogs supported by the unpaid labor of FFS students in the canine operation conducted by its own founder and president, and the benefit of the labor of the student body, including Plaintiff, that ran the institution housing that operation; as to the Highlights Defendants, upon information and belief, the portion of the enterprise's tuition-funded money that flowed to them through the integration of their publications into the purported education the venture sold, together with the uncompensated labor of FFS students at their Wayne County retreat; as to The Hancock Herald, revenues derived from its promotional relationship with the operation; as to NATSAP, membership dues paid from the operation's revenues; as to Lackawanna College, the payments it received from the families of FFS students, including Plaintiff's, for coursework delivered on the campus by the enterprise's own staff; and as to the Village of Hancock, the Town of Hancock, the County of Delaware, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors, upon information and belief, the economic benefit of the operation's continuation within their communities, as alleged in Count I.

175. Lackawanna College's knowledge was of a different character from that of a vendor who dealt with the institution at a distance, because its courses were delivered on the FFS campus. During Plaintiff's enrollment, Lackawanna College's coursework was taught, in part, by FFS staff members, including Jan Cheripko, who lived and worked on the campus, and Michael Ducey, the leader of the family unit in which Plaintiff was held, who imposed and administered the sanctions,

labor, and food regime described herein; the children sitting in Lackawanna College's classes were the same children who were pulled from instruction for the corner, for enforced silence, for work sanctions, and for the labor described herein, and who returned to those classes from them. The instructors through whom Lackawanna College delivered and received payment for its courses saw those conditions daily, and as to the leader of Plaintiff's own family unit, administered them. Lackawanna College thereby knew, or was in reckless disregard of the fact, or in the circumstances alleged herein should have known, that the venture from which it was receiving payment obtained the labor and services of the children in its custody by the means alleged herein, and it continued, with that knowledge, to deliver its coursework on the campus, to lend the venture the standing of accredited coursework, and to receive payment, including the payments Plaintiff's parents were separately billed for the doubled courses through which the institution graduated her.

176. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count. All applicable limitations periods are tolled as set forth supra.

## COUNT XXI: KNOWING BENEFICIARIES OF SEX TRAFFICKING (18 U.S.C. §§ 1591(a)(2) AND 1595)

**(Against All Defendants Other Than NBT Bank, N.A., NBT Bancorp Inc., Sysco Corporation, and Sysco Syracuse, LLC)**

177. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

178. The operation of FFS was a venture engaged in violations of 18 U.S.C. § 1591, as alleged herein, including the sex trafficking of children in its custody established by the federal criminal conviction of Defendant Paul Geer alleged herein, including on the Toronto trip in 2001, during Plaintiff's enrollment; the sexualized intake practices, including, on information and belief, the

photographing of unclothed children, to which Plaintiff herself was subjected; the exposure of minor girls, including Plaintiff, to sexual material at the institution's table; and the transport of Plaintiff, a minor, out of the country to Toronto in the custody of Defendant Geer himself. Each Defendant named in this Count knowingly benefited, financially or by receiving anything of value, from participation in that venture, knowing or in reckless disregard of the fact that the venture engaged in the sex trafficking of children in its custody. As to Education Plus Corporation and the Argiros Defendants, that knowledge was actual: the venture's administration had been told, years before Plaintiff's arrival, that Geer had confessed to sexual misconduct with students, had refused to remove him because of the value of his choir to the institution, had reported nothing to anyone; on information and belief, in or about 2001, during Plaintiff's enrollment, a student whom Geer had sexually assaulted on a chorus trip to Toronto reported the assault to Emmanuel Argiros, and no report was made and no action taken; and the venture kept Geer on staff and in custody of children, including on the trips to Toronto on which Plaintiff was transported, throughout Plaintiff's enrollment.

179. The benefits received by each Defendant named in this Count are those set forth in Count XX, each of which flowed from a venture that was, at the same time and through the same principals, engaged in the sex trafficking of the children whose labor produced them.

180. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count. All applicable limitations periods are tolled as set forth supra.

## COUNT XXII: KNOWING BENEFICIARY OF A FORCED LABOR AND LABOR TRAFFICKING VENTURE (18 U.S.C. §§ 1589(b), 1590, AND 1595)

**(Against NBT Bank, N.A. and NBT Bancorp Inc.)**

181. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

182. The operation of FFS was a venture engaged in violations of 18 U.S.C. §§ 1589 and 1590, as alleged herein. NBT Bank, N.A. knowingly benefited, financially and by receiving things of value, from participation in that venture: it maintained the operation's accounts and those of its principals, processed the operation's payroll, held blanket security interests in the operation's assets, including its tuition receivables and enrollment contracts, among them the contract under which Plaintiff was enrolled, extended secured credit to the operation and its property-holding entity, and received fees, interest, and deposit balances swollen by the wages the operation never paid, including in connection with the tuition paid on Plaintiff's behalf. The bank's relationship with the venture was not that of a passive depository: it was the venture's secured lender, it underwrote and, on information and belief, inspected and appraised the very campus on which the children labored, it held liens on the operation's inventory, accounts, and contract rights from 2002 forward, first taken on December 2, 2002, six months after Plaintiff's departure, and renewed and expanded thereafter, and it held, from March 24, 2010, a mortgage on the campus itself; and after the school closed it continued to receive things of value from the venture, holding its lien on the enterprise's collateral by continuation through December 18, 2021, holding its lien on the transferee of the campus from February 27, 2015 through February 27, 2020, and, on information and belief, collecting interest, fees, and the proceeds of the enterprise's assets throughout, benefits received within the years immediately preceding the filing of this action.

183. The bank's collateral was, in substantial part, itself the product of the children's labor. The campus real property securing its March 24, 2010 loan to the title-holding family entity, and the equipment, inventory, and improvements swept by its blanket security interests, including the first interest, taken on December 2, 2002, six months after Plaintiff's departure, were built, renovated, maintained, and improved by the unpaid labor of the children in the venture's custody, so that the forced labor alleged herein directly enhanced and preserved the value of the collateral securing the bank's own position, and the bank held, through its liens, a direct financial stake in the product of that labor. Plaintiff's own labor is part of that collateral: the kitchen she ran each morning was the equipment and the operation the bank's liens expressly covered; the walkways she cleared, the laundry she did, and the buildings and grounds she cleaned and inspected were the upkeep of the very real property against which the bank lent and in which it held its security; and the food she handled, prepared, and, on information and belief, unloaded was the inventory covered by that lien, stocked into the bank's collateral by a child's hands. A lawful residential school pays adults to do that work; this venture had children do it, and the bank's collateral was worth more, and its borrower more creditworthy, for every hour of it. The bank therefore held a direct financial interest in the continuation of the operation and in the continued confinement of the children in it: without enrolled children there was no tuition to repay the bank, and without children to house there was no operating campus to secure it.

184. NBT Bank knew, or was in reckless disregard of the fact, or in the circumstances alleged herein should have known, that the venture from which it benefited obtained the labor and services of the children in its custody by unlawful means, for the reasons and on the notice progression set forth in Counts IV and VIII supra, including the public record of the operation's unlicensed operation, the 2008 congressional hearings, the knowledge of its Hancock branch manager, Dawn

Joyce, who administered the School's accounts and credit and served under the School's president as a director of the corporation the bank sponsored, which is the bank's own knowledge, the secured-lender knowledge arising from its own collateral position in the operation's receivables, inventory, and real property, including, upon information and belief, the repeated inspection and appraisal of the campus incident to its secured lending against it over the life of the relationship, on which the children's labor maintaining that collateral was open and visible, and the financial records that passed through its own ledgers, which showed an operation whose only revenue was tuition and whose expenditures on the children were a fraction of what any lawful residential facility spends, and which, on information and belief, included, year after year through 2014, the payroll of a staff member whose confessed sexual misconduct with students the administration had chosen to keep on staff; and, in the alternative, if the bank did not conduct the inspections, appraisals, and financial reviews its own standards required, its departure from those standards was a deliberate avoidance of the knowledge they would have supplied. NBT Bancorp Inc. is liable as its controlling parent as alleged herein. Among the things of value NBT Bank received from the venture were the deposit, lending, fee, and payoff revenue described herein and, on information and belief, the standing and business it drew from being held out as the community's bank through organizations the School's president ran. NBT Bank was not a passive depository of the venture's funds: it was the venture's secured lender, its mortgagee, and the holder and processor of its payroll, in a continuous relationship that ran from before the first lien through the conveyance it financed and the transferee it took, and its participation in the venture was, for those reasons, beyond that of a provider of routine financial services.

185. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the

Defendants named in this Count, jointly and severally. All applicable limitations periods are tolled as set forth supra.

**COUNT XXIII: KNOWING BENEFICIARY OF A FORCED LABOR AND LABOR TRAFFICKING VENTURE (18 U.S.C. §§ 1589(b), 1590, AND 1595)**

**(Against Sysco Corporation and Sysco Syracuse, LLC)**

186. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

187. The operation of FFS was a single, continuous venture from its founding through its 2014 closure, engaged in violations of 18 U.S.C. §§ 1589 and 1590, as alleged herein, by the same methods and on the same campus throughout, including during Plaintiff's enrollment. Sysco knowingly benefited, financially and by receiving things of value, from participation in that venture. Throughout the relevant period, including throughout Plaintiff's enrollment, Sysco supplied the operation's kitchen on a recurring, scheduled basis, its trucks delivering food and institutional supplies directly to the FFS campus, and it was paid for those goods and deliveries, delivery after delivery, year after year, from the tuition-funded accounts described herein, tuition the operation retained as margin because it paid no wages for the labor the children performed. Sysco's participation was not that of an arm's-length vendor. At each recurring delivery it received the children's labor itself, without cost, in the unloading of its own trucks by the children of the institution, without any adult labor crew in their place. Plaintiff was among those children: as the head of the institution's breakfast crew she drew the food Sysco delivered from the institution's coolers and prepared and served it for the entire school each morning, she washed the institution's dishes on its evening crew, and, on information and belief, she was among the students who received and unloaded Sysco's deliveries in the presence of its delivery personnel. The benefits Sysco received were thus twofold and direct: years of recurring institutional sales revenue paid

from the proceeds of the venture, and the children's unloading, handling, and kitchen labor, including Plaintiff's, received at the truck and in the kitchen at every delivery.

188. Sysco knew, or was in reckless disregard of the fact, or in the circumstances alleged herein should have known, that the venture from which it benefited obtained the labor and services of the children in its custody by unlawful means. Its knowledge was of a different character from that of any other Defendant: not financial inference but direct physical observation. Sysco's own delivery personnel were on the campus at every delivery, taking the work of children's hands off Sysco's own trucks, and Sysco's own delivery volume showed that it was provisioning an institutional kitchen for hundreds of residents that, on its employees' own observation, was stocked and staffed by the children it was feeding. That knowledge, acquired by Sysco's employees in the course of their duties, is the knowledge of Sysco. Sysco made no inquiry, no report, and no disclosure to any authority at any time, and continued to supply the operation, to accept payment from it, and to accept the children's unloading labor throughout.

189. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from Sysco Corporation and Sysco Syracuse, LLC, jointly and severally. All applicable limitations periods are tolled as set forth supra.

## COUNT XXIV: KNOWING BENEFICIARIES OF FORCED LABOR AND LABOR TRAFFICKING (18 U.S.C. §§ 1589(b), 1590, AND 1595)

**(Against Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc.)**

190. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

191. Chapel Hill Land Holdings LLC and French Woods Performing Arts Inc. knowingly benefited, financially and by receiving things of value, from participation in the venture alleged

herein, which obtained the labor and services of the children in its custody, including Plaintiff, by the means prohibited by 18 U.S.C. §§ 1589 and 1590. The thing of value they received was the venture's principal asset: the campus at 431 Chapel Hill Road and every dormitory, dining facility, chapel, field, and improvement on it, built, repaired, cleaned, and maintained over decades by the uncompensated labor of FFS students, including the kitchen Plaintiff herself ran each morning, the walkways she cleared, and the buildings and grounds she cleaned and inspected between 1999 and 2002. Chapel Hill Land Holdings LLC received that asset in November 2014 for less than its assessed value, from an insider, on the venture's own lender's financing, with the venture's records in an outbuilding on the premises; French Woods Performing Arts Inc. took possession of it and has operated it as a residential camp every season since, housing, feeding, and charging campers for the structures the children built, at a charge, on information and belief, of up to approximately $16,000 per camper per summer. Each season's revenue is a benefit received from the fruits of the children's labor, and each is a benefit received within the years immediately preceding the filing of this action. Their participation in that venture was not that of an arm's-length purchaser. The venture's conduct did not end with the School's closure: its conveyance of the campus, its concealment of the records kept on that campus, and its retention of the proceeds continued through 2014 and after, and these Defendants participated in those acts, taking the venture's principal asset from the venture's own insider entity in its wind-down, at less than its assessed value, on the venture's own lender's financing, with the venture's records on the premises, through a principal who sits, beside the venture's own lender's branch manager, on the board of the corporation the venture's president presides over, and continuing the venture's use of the campus and its structures as a residential facility for children every season since, charging, on information and belief, up to approximately $16,000 per camper per summer for the dormitories, dining facilities, chapel, and

grounds the children built and maintained without pay. A venture that has engaged in forced labor does not cease to be one because its campus passed to a participant with notice who continues to profit from the fruits of that labor every season, and these Defendants knew or should have known that the venture had engaged in the violations alleged herein.

192. These Defendants knew, or in the circumstances alleged herein should have known, that the venture from which they benefited had obtained that labor by unlawful means: their principal was a neighbor and friend of the Argiros family for many years and sat with the School's president on the board of Hancock Partners, Inc.; the School had been publicly accused, publicly investigated by four State agencies, and publicly closed before the conveyance; the structures they took were visibly the work of children, built on a campus whose published program was that its students built and maintained it; the School's records sat in an outbuilding under their control for a decade; and, after the 2024 federal indictment, the 2025 public trial at which the School's president admitted the destruction of records, the March 3, 2025 conviction, and written notice in September 2026 to preserve the outbuilding and its contents, they denied its existence and refused inspection. They have never disclosed what they received or what they held, and they continue to receive the benefit today.

193. As a direct and proximate result, Plaintiff suffered the injuries alleged herein, and pursuant to 18 U.S.C. § 1595 she is entitled to recover her damages and reasonable attorneys' fees from the Defendants named in this Count, jointly and severally, together with disgorgement of the benefits they received from the venture. All applicable limitations periods are tolled as set forth supra.

**COUNT XXV: CIVIL REMEDY FOR PERSONAL INJURIES (18 U.S.C. § 2255)**

**(Against Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Paul Geer)**

194. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

195. Plaintiff, while a minor, was a victim of violations of 18 U.S.C. § 2423(a). During her enrollment, Defendants Education Plus Corporation, Betty Argiros, Emmanuel Argiros, Cindy Argiros, and Paul Geer knowingly transported Plaintiff, then fourteen to seventeen years old and a minor in their custody, in interstate and foreign commerce from the FFS campus in New York to Toronto, Ontario, Canada, to Washington, D.C., to Virginia, and to Pennsylvania and back, in the custody of FFS staff, including, on the Toronto trips, Defendant Geer, a staff member who had confessed sexual misconduct with students and whom the institution kept in charge of its trips, on trips of the same kind, in the same period, and under the same supervision as the trip to Toronto in 2001 for which Geer was convicted of transporting an FFS student in foreign commerce for sexual activity. Among the purposes of that transport, which need not have been its sole purpose, was the continuation and maintenance of the regime of custody, control, sexualized intake, and labor to which Plaintiff was subjected at FFS, including the strip search and, on information and belief, the photographing that Defendants' uniform intake policy required of children entering the institution's custody, conduct constituting sexual activity for which a person can be charged with a criminal offense under New York law, including the use of a child in a sexual performance; and the transport was carried out by an institution that, with knowledge of Geer's confessed sexual misconduct with students on such trips, continued to take minor children out of the State and out of the country in his custody. Defendants acted in concert with one another within the meaning of 18 U.S.C. § 2423(e). Plaintiff, while a minor, was additionally a victim of violations of 18 U.S.C. §§

2251 and 2252. During Plaintiff's August 1999 intake, as described herein, Defendant Education Plus Corporation, acting through the staff who carried out the uniform intake policy that it and Defendants Betty Argiros, Emmanuel Argiros, and Cindy Argiros adopted, directed, and enforced, on information and belief used and employed Plaintiff, then a fourteen-year-old minor, in the production of a visual depiction of Plaintiff taken in the course of and immediately after the intake strip search described herein and before Plaintiff had been permitted to dress, depicting her unclothed, in violation of 18 U.S.C. § 2251, using photographic film, cameras, and materials that had been mailed, shipped, and transported in interstate and foreign commerce; and, on information and belief, that photograph was placed directly into a book maintained by the institution and knowingly retained and possessed by Defendant Education Plus Corporation through at least FFS's 2014 closure, in violation of 18 U.S.C. § 2252.

196. As a direct and proximate result of those violations, Plaintiff suffered personal injuries as alleged herein, including the injuries arising from the strip search, the photography, and the institution's retention of that image of her. Pursuant to 18 U.S.C. § 2255, Plaintiff is entitled to recover her actual damages, and in any event liquidated damages in the amount provided by 18 U.S.C. § 2255 of no less than $150,000, together with the cost of the action and reasonable attorneys' fees. This Count is subject to no limitations period, and all applicable limitations periods are in any event tolled as set forth supra.

## COUNT XXVI: CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983: FOURTEENTH AMENDMENT: STATE-CREATED DANGER AND DELIBERATE INDIFFERENCE TO KNOWN ABUSE

**(Against the Village of Hancock, New York, individually and through the Village of Hancock Police Department; the Town of Hancock, New York; the County of Delaware, New York; the Delaware County Sheriff's Office; and the Delaware County Board of Supervisors)**

197. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

198. At all relevant times, the Village of Hancock, acting through Hancock PD, the Town of Hancock, the County of Delaware, the Delaware County Sheriff's Office, and the Delaware County Board of Supervisors acted under color of state law within the meaning of 42 U.S.C. § 1983. Plaintiff possessed a constitutionally protected liberty interest in personal security and bodily integrity under the Fourteenth Amendment.

199. Throughout Plaintiff's enrollment, on information and belief, Hancock PD maintained a standing practice and custom of locating children who ran away from FFS and returning them to the institution's custody without inquiry into why they had fled, and FFS students, including Plaintiff, understood that flight was futile because the institution's staff, its dogs, and the local police would return them. By affirmatively returning runaway children to a private actor whose unlicensed operation was a matter of official record, without inquiry, Hancock PD created and enhanced the danger to every child confined at FFS, including Plaintiff, foreclosed the one avenue of escape and report a confined child had, and rendered Plaintiff more vulnerable than she would otherwise have been, in violation of her substantive due process rights. On information and belief, the institution supplied its intake photographs of its students, including Plaintiff, to Hancock PD

for that purpose. Plaintiff, delivered to the institution by police escorts and held there under the regime described herein, understood, as the institution intended, that flight was futile and that, had she reached the village, the local police would have returned her to the institution. The practice was carried out pursuant to the standing custom of Hancock PD, for which the Village is liable.

200. Upon information and belief, and consistent with the pattern of deliberate indifference alleged as to other FFS students across multiple years, Hancock PD and the Delaware County Sheriff's Office were aware of the 1990 cease and desist order, the official notice record described herein, including the December 2010 joint findings of four New York State agencies, and the pattern of abuse those records evidenced, and nonetheless permitted FFS to continue operating without effective oversight throughout Plaintiff's 1999-2002 enrollment, including by returning children who fled the campus to the custody of the enterprise. The Town of Hancock, within whose borders the FFS campus operated and whose officials possessed the same notice record, likewise permitted FFS to operate without effective oversight, and that failure constitutes a policy or custom of deliberate indifference to known, ongoing child abuse for which the Town is liable. The Delaware County Board of Supervisors' failure to exercise oversight authority over the Sheriff's Office notwithstanding that knowledge constitutes a policy or custom of deliberate indifference to known, ongoing child abuse for which the County is liable.

201. As a direct and proximate result of Defendants' conduct and deliberate indifference, Plaintiff continued to suffer conditions that would have been halted had Defendants fulfilled their constitutional obligations, including the forced labor, food restriction, isolation, and confinement described herein. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees pursuant to 42 U.S.C. § 1988. All applicable statutes of limitations are tolled as set forth supra.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Emily Caponera respectfully demands judgment against Defendants, jointly and severally, as follows:

(A) Compensatory damages in an amount to be determined at trial, but in no event less than $5,000,000, including the cost of past and future medical, psychiatric, and therapeutic care, lost earnings and earning capacity, the value of the uncompensated labor extracted from Plaintiff, and restitution of all tuition and charges paid;

(B) Treble damages pursuant to 18 U.S.C. § 1964(c) on Plaintiff's RICO claims, in no event less than $15,000,000;

(C) Punitive damages in an amount sufficient to punish Defendants for their willful, malicious, and egregious conduct and to deter similar conduct in the future;

(D) Attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c), 18 U.S.C. § 1595, N.Y. Social Services Law § 483-bb(c), 18 U.S.C. § 2255, 42 U.S.C. § 1988, and all other applicable statutes;

(E) Pre-judgment and post-judgment interest at the maximum rate permitted by law;

(F) Declaratory and injunctive relief as appropriate; and

(G) Any and all other relief this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: Brooklyn, New York
October 14, 2026

Respectfully submitted,

JOHANNESEN & UMANA, P.C.

*Attorneys for Plaintiff*

By: ________________________________

Elizabeth Sarah Johannesen, Esq.

*Founding Partner*

68 Jay Street, Suite 225

Brooklyn, New York 11201

P: (631) 559-1018

elizabethsarahjohannesen@esjlaw.info

## VERIFICATION

STATE OF FLORIDA )
) ss.:
COUNTY OF Broward )

I, Emily Caponera, am the Plaintiff in the above-captioned action. I have read the foregoing Verified Complaint and know the contents thereof. The contents are true to my own knowledge, except as to matters alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on: 10/15/2026

Emily Caponera